J-A08021-19

2020 PA Super 88

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GREGORY SCOTT HOPKINS | |
| Appellant | No. 941 WDA 2018 |

Appeal from the PCRA Order Enterer June 21, 2018
In the Court of Common Pleas of Beaver County
Criminal Division at No: CP-04-CR-0000580-2012

BEFORE:  PANELLA, P.J., STABILE, and McLAUGHLIN, JJ.

OPINION BY STABILE, J.:                    **FILED APRIL 6, 2020**

Appellant, Gregory Scott Hopkins, who is serving a sentence of eight to sixteen years' imprisonment for third degree murder,[1] appeals from an order denying his petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.  The victim, Janet Walsh, was strangled to death in her apartment on September 1, 1979.  The police interviewed Appellant, who admitted having a casual sexual relationship with Walsh that summer but insisted he was not with Walsh at the time of her death.  In 2012, Appellant was charged with Walsh's murder following the discovery of his seminal DNA on several items recovered from the crime scene.  The Commonwealth presented expert testimony from a forensic pathologist, Cyril Wecht, M.D., that the "topographical distribution" of Appellant's semen at the crime scene

---

[1] 18 Pa.C.S.A. § 2502(c).

demonstrated he was with Walsh at the time of her death.  In this appeal, Appellant argues that his trial counsel was ineffective for failing to file a **Frye**[2] motion to preclude Dr. Wecht's testimony on the ground that the methodology underlying his opinion was not generally accepted in the field of forensic pathology.  We agree with Appellant.  The record demonstrates that no scientific method exists for dating DNA deposits, and that Dr. Wecht's methodology is not generally accepted in the forensic pathology field.  We conclude trial counsel had no reasonable basis for failing to seek preclusion of Dr. Wecht's testimony under **Frye**, and the admission of his testimony caused substantial prejudice to Appellant.  Accordingly, we reverse and remand for a new trial.

**I. Factual and Procedural History**

On September 1, 1979, Walsh's father discovered her body in the bedroom of her apartment in Monaca, Pennsylvania.  When police first observed her body that day, Walsh was lying face down, covered with a sheet.  She was wearing a short nightgown, and her hands were bound behind her back with a cloth bathrobe belt.  A bandana was wrapped around her neck, and there was a bathrobe at the foot of the bed.  There was no sign of forced entry into the apartment, where she resided alone.  She had recently separated from her husband, Scott Walsh, and was in the process of obtaining a divorce.

---

[2] **See Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923), adopted in Pennsylvania in **Commonwealth v. Topa**, 369 A.2d 1277 (Pa. 1977).

The pathologist who performed Walsh's autopsy concluded that she died from ligature strangulation between 5:00 a.m. and 7:00 a.m. on September 1, 1979. Neither the investigating officers nor the pathologist who performed the autopsy observed signs of recent sexual activity. They found no signs of semen or ejaculate on her body, on her nightgown, on the top sheet or the fitted sheet from the bed, on the tie that bound her hands, or on her ligature. A State Police criminalist conducted a close visual inspection and textile examination of the physical evidence, which included running his hands over the fabric, the clothing and ligature, and concluded there was no trace evidence of any sexual activity.

The police did not recover any foreign pubic hairs. Swab samples from Walsh's mouth and vagina revealed no evidence that she was engaged in sexual conduct. An inspection for material under her fingernails was also negative. The medical examiner concluded that Walsh had not been raped and was not having sexual intercourse at the time of her death.

On the evening before her death, Walsh went out dancing at a nightclub with friends. The last individuals with Walsh were Margie Farinacci, a friend, and Robert McGrail, a drifter who met Walsh that night and danced with her. McGrail accompanied Walsh and Farinacci to a restaurant at 2:30 a.m., where he remained until at least 3:30 a.m. McGrail's checkbook was found in a gutter in the vicinity of Walsh's apartment shortly after her murder.

At the beginning of the investigation, the police spoke to Appellant about his relationship with Walsh. Like Walsh, he was going through a divorce that

summer. He admitted having casual sex with her several times in her apartment during the summer of 1979. They sometimes had sex more than once in an evening, and he sometimes ejaculated on her back. He stated that their last sexual encounter in the apartment occurred three to four weeks before her death. Appellant claimed he was not with Walsh on the morning of her death but instead he was at home several miles from her apartment, where he woke up around 5:30 a.m. with guests to prepare for a pig roast he was holding for employees in his construction business.

For more than thirty years after Walsh's death, there were no investigative leads. In 2010, using technology not available in 1979, the State Police found Appellant's seminal DNA on the top sheet that covered Walsh's body, the bathrobe belt tied around her hands, and her nightgown. In 2012, based on this DNA evidence, the Commonwealth charged Appellant with Walsh's murder and advanced the theory that Walsh died during a sexual encounter with Appellant. The trooper who testified at Appellant's preliminary hearing admitted he could not say whether semen deposits occurred on September 1, 1979 or some earlier date. The trooper did not know whether the clothing items were washed between Appellant's sexual encounter(s) with Walsh prior to September 1, 1979. Most of the DNA found on the evidence was too degraded to be tested. Appellant's DNA did not match swabs taken from Walsh's vagina and mouth on September 1, 1979, and no DNA was obtained from the bandana used to strangle Walsh.

The Commonwealth obtained an expert report from Dr. Wecht that addressed (1) how Appellant's semen was likely deposited, and (2) the probability that Appellant's seminal fluid was deposited during sex with the decedent earlier in the summer of 1979. Dr. Wecht wrote that the placement of Appellant's seminal fluid on the back of Walsh's nightgown, the cloth belt tied around her wrists, and the bed sheet "place him on the bed on top of the decedent's back at/around the time of her demise." Report, at 4. Dr. Wecht continued, "[I]t is extremely unlikely that [Appellant's] seminal fluid was deposited in those locations during the two or three previous sexual encounters [Appellant] admitted to have engaged in during the summer three weeks to a month prior to the victim's death." *Id.* He further opined that "the location of the seminal fluid in both areas where the fluid was identified is further consistent with the decedent's position when found." *Id.*

Dr. Wecht opined that the victim died due to strangulation during sexual activity hours before the discovery of her body, and that "the DNA of [Appellant's] seminal fluid would have been deposited around the time of her death based on the locations where it was identified." *Id.* He stated that, given the DNA analysis, there was no evidence a third person was present. "[T]he absence of any signs of struggle or forced entry into her apartment," he contended, "is a strong, logical argument that [] Walsh's assailant was someone she knew, and who would have been allowed entry into her apartment." *Id.*

Counsel for Appellant filed a pre-trial motion seeking preclusion of Dr. Wecht's expert testimony and report on two grounds. First, counsel wrote, "the proffered expert testimony does not distinctly relate to a science, skill, or occupation beyond the knowledge or experience of the average layman and is submitted only to buttress the Commonwealth's argument on its theory of the case." Appellant's Brief in Support of Motion to Preclude, 10/19/12, at 1-2. Second, counsel stated, Dr. Wecht failed to express his opinion with the requisite degree of certainty by stating the semen was "likely" deposited around the time of Walsh's death, and it was unlikely the semen was deposited on previous occasions. *Id.* at 5-6 (citing **Commonwealth v. Davido**, 868 A.2d 431, 441 (Pa. 2003) ("[t]he expert has to testify . . . that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence")). Counsel, however, did not file a **Frye** motion to preclude the evidence on the ground that Dr. Wecht's methodology of ascertaining the date of the DNA deposits from their locations at the crime scene was not generally accepted in the forensic community. At oral argument on November 13, 2012, counsel repeated the arguments he made in the motion to preclude, N.T., 11/13/12, at 2-13, and criticized Dr. Wecht's report as "conjecture and speculation," *id.* at 3, 6, 9, but did not argue that Dr. Wecht's testimony was inadmissible under **Frye**.

In an opinion and order dated November 5, 2012, the trial court granted Appellant's motion to preclude, reasoning:

[Dr. Wecht's] report does not set forth any scientific manner upon which [he] bases his conclusion that [Appellant] was on top of the decedent's back around the time of her demise. Further, the report does not set forth the scientific method or means by which Dr. Wecht reaches the conclusion that because the DNA was found only on the bed sheet, the rope tie, and the nightgown, it is unlikely that [Appellant]'s seminal fluid was placed there during sexual relations that occurred three weeks to a month earlier. As such, Dr. Wecht does not state a precise scientific basis for his conclusions, and Dr. Wecht's assertions are not set forth or posited in a sufficiently specific manner. Furthermore, we conclude that Dr. Wecht's statement that "it is extremely unlikely" that the seminal fluid was placed in certain locations several weeks earlier, given the locations where the fluid was found, is too vague and imprecise to meet the standard for competent expert medical testimony in accordance with Pennsylvania law. Therefore, the opinions set forth in his report are speculative in nature and are thus not admissible. Moreover, we conclude that the question regarding whether it is unlikely that the seminal fluid was placed in the locations where the fluid was found at a time several weeks earlier does not necessitate the use of scientific, technical or specialized knowledge beyond that possessed by a layperson.

Trial Court Opinion, 11/5/12, at 6.

Pursuant to Pa.R.A.P. 311(d), the Commonwealth timely appealed to this Court at Docket No. 1776 WDA 2012 on the ground that the trial court's order substantially handicapped the prosecution of this case. In this Court, counsel for Appellant[3] made the same arguments that he made in the trial court, *i.e.*, Dr. Wecht's opinion was speculative, was not expressed with the requisite degree of certainty, and did not relate to a science, skill, or

_____

[3] Appellant was the appellee in the appeal at 1776 WDA 2012, but for the sake of consistency, we continue to refer to him as "Appellant."

occupation beyond the knowledge or experience of the average layperson. Brief for Appellant, 1776 WDA 2012, at 10-18.[4] Counsel added that Dr. Wecht "[did] not . . . set forth any probative facts to support his conclusions that the seminal fluid was deposited on the day in question as opposed to some other date." *Id.* at 12.

In a 2-1 decision, this Court reversed and, without elaboration, held that Dr. Wecht's report "[met] Pennsylvania's liberal standard for expert testimony," because he "assert[ed] facts not generally known but known to him because of his special training and experience." ***Commonwealth v. Hopkins***, 1776 WDA 2012, unpublished memorandum at 6-7 (Pa. Super. filed October 4, 2013)). The majority also held that Dr. Wecht stated his opinion "with the requisite degree of certainty." *Id.* at 7. Judge Ford Elliott dissented on the ground that

> Dr. Wecht's conclusions appear to be merely his own thoughts on the evidence and not based on any scientific or forensic analysis. In addition, as the trial court states, the issue whether, as Dr. Wecht concluded, it was "extremely unlikely" [Appellant's] seminal fluid could have been deposited three weeks earlier, based on the locations where the fluid was found, without more to substantiate this conclusion, does not represent the use of scientific or technical knowledge beyond that possessed by a layperson.

---

[4] Appellant did not include this brief in his reproduced record in the present appeal, but we have the authority to take judicial notice of the entire record in this case, including all prior proceedings. ***In Re Schulz' Estate***, 139 A.2d 560, 563 (Pa. 1958).

- 8 -

*Id.*, concurring and dissenting memorandum at 1-2.  Appellant did not seek further review by our Supreme Court.

The case proceeded to a jury trial.  Trooper Matas, the state trooper who investigated the crime scene on September 1, 1979, testified that he saw the victim lying face down on her bed with a bandana tied around her neck and her hands bound behind her back.  N.T. Trial, 11/13/13, at 25-26.  To observe the victim in this position, he removed the top sheet that covered her (the sheet on which investigators discovered Appellant's DNA decades later).  *Id.* at 26.  He also learned that (1) the victim's body had been covered by a sheet when her father discovered her body earlier that morning, and (2) her father had "removed the sheet to a certain extent, and I can't tell you to what extent."  *Id.* at 68.  The trooper added that prior to his arrival, the sheet had been removed from the body, and "not just once."  *Id.*

The trooper acknowledged that as a trained investigator, he would have looked carefully at the nightgown on the victim's body.  *Id.* at 76.  He did not notice any staining or wet marks on the nightgown.  *Id.* at 76-77.  Nor was the nightgown sticking to the victim's back in any way.  *Id.* at 77.  He knew what semen looked like on material, but he did not observe any white or crusty material on the nightgown.  *Id.*  Nor did he see any stain or crust on the robe tie that bound the victim's hands.  *Id.* at 78.

Ashlee Mangan, a State Police forensic scientist, testified that she examined evidence from the crime scene in 2010.  Using an alternate light

source, she identified two areas of sperm on the top right and middle portions of the sheet, as well as areas of sperm on both the robe tie that bound the victim's hands and her nightgown. N.T. Trial, 11/15/13, at 64, 107-08. None of these areas were visible to the naked eye. *Id.* at 114. She agreed that DNA testing does not determine when sperm is deposited. *Id.* at 92.

The Commonwealth called Dr. Wecht to the stand. Dr. Wecht testified that he has been recognized as an expert in forensic pathology in Pennsylvania, throughout the United States, and in other parts of the world. *Id.* at 155. He has participated in "countless" homicide cases, has authored 570 publications relating to forensic pathology and related subjects, and has authored or edited 44 books for the professional field. *Id.* at 156-57. A school is named after him, the Cyril Wecht Institute of Forensic Science and Law at Duquesne University. *Id.* at 157. Based on these credentials, the trial court admitted Dr. Wecht to testify for the Commonwealth as an expert in forensic pathology. *Id.* at 158.

Dr. Wecht testified that a forensic pathologist is a medical doctor who has trained five or six years in pathology following medical school. *Id.* Among other things, a forensic pathologist determines the cause of sudden, violent, unexpected deaths. *Id.* at 159-60. Dr. Wecht told the jury that the victim died from strangulation from behind during sexual intercourse, and he stated:

> The reports indicated that seminal fluid matched the DNA to [Appellant] was found in three locations, what is referred to as the flat sheet, the sheet, I guess, beneath the blanket that overlies the body when you would be in bed normally and then on a, an

upper nightgown, like a nightgown top, and then the bathrobe belt that had encircled her hands[.]

*Id.* at 173. In Dr. Wecht's opinion, the **"topographical distribution"** of Appellant's semen, *i.e.*, the three locations in which Appellant's semen was found, showed that all of the semen was deposited at the same time, around the time of Walsh's death. *Id.* at 173-74. Dr. Wecht rejected Appellant's contention that transmission of semen took place during a sexual encounter three to four weeks before Walsh's death, stating:

Number one, I believe, based upon these three locations, they're topographical distribution. They adjunct the position and so on, and the position of the body was found face down, prone, that that was the result of an ejaculation, a male ejaculation that occurred as the victim was lying down and that some of the ejaculate got into her, in those locations. That's number one.

Number two, the three areas that fit in also in terms of that anatomical topographical distribution. **DNA testing does not tell you in and of itself the time that that material, whatever it may have been, has been deposited.** That is correct. That needs to be said as part of the answer.

**My opinion is based upon the locations of the three sites** at which the seminal material was found, the position of the body, and then when I consider that with the suggestion that these sites could have been the result of a deposition of male ejaculate three, four weeks before, I find that hard to believe. As a 23-year-old woman, she has a job. She works. She sees people. She has a social life and so on. For me from an investigative analytical standpoint to conceive that somehow four weeks have gone by and she has not thoroughly washed a sheet that she sleeps under, that she has not washed the belt of a bathrobe that she uses, that she's still wearing a nightgown that she sleeps in, I just find that extremely unlikely and [it] is on all of those findings that I express the opinion that I did.

*Id.* at 173-75. (Emphasis added). Dr. Wecht also "[could not] accept" the premise that DNA was transferred in the process of washing garments:

> If there was such contamination via washing, then it might have been here, might have been there. But I find it extremely unlikely, remarkably fortuitous that there would have been such contamination resulting in the deposition then of seminal material in those three places that you have contamination from the washing that Miss Walsh would have undertaken presumably by herself, out come the garments and so on, and lo[] and behold there are the seminal stains right there where she was found bound on that bathroom rope, on the nightgown, and on the sheet that overlies it in that area.
>
> I just . . . can't accept that kind of explanation, so the process of contamination in general, theoretically, can it occur, yes. Does it occur then in those three topographical areas that fit perfectly into this sexual assault homicide, no, I don't believe that that is at all likely.

*Id.* at 181. Dr. Wecht emphasized that "all of the opinions I have expressed have been expressed within a reasonable degree of medical forensic scientific certainty of probability." *Id.* at 183; *see also id.* at 220 (all of his opinions were within a reasonable degree of "forensic pathological and forensic scientific certainty").

Dr. Wecht admitted he could not date the deposit of DNA based upon the locations where it was identified. Indeed**, he admitted that no test existed for dating DNA deposits**, *id.* at 214, an admission with which every other witness who gave expert testimony on DNA findings concurred. *Id.* at 144-45 (State Police forensic scientist Biondi); N.T. Trial, 11/15/13, at 92 (Mangan); N.T. Trial, 11/18/13, at 32-33, 40 (State Police forensic DNA scientist Brown); N.T. Trial, 11/20/13, at 80 (defense DNA expert Perlin). Dr.

Wecht could not explain how Appellant could have ejaculated on Walsh without detection of his semen by police, crime lab analysts, and medical personnel who observed Walsh's body and linens within a few hours of her death. *Id.* at 185, 193-94, 198-99. He further admitted that because DNA transfers from one object to another, it is impossible to state that the place upon which DNA is presently located is the exact location upon which the contributor deposited it in the first place. *Id.* at 180-81.

Counsel for Appellant did not ask Dr. Wecht whether the methodology he used was generally accepted in the scientific community. Nor did the Commonwealth show, or attempt to show, that the science of forensic pathology generally accepts a methodology to date DNA deposits based on **"topological distribution."**

Appellant called two experts, Dr. Mark Perlin, a DNA expert, and Dr. Michael Panella,[5] a forensic pathologist. Both experts disagreed with Dr. Wecht's conclusions that the location of the sperm and position of the victim's body showed that Appellant deposited the sperm around the time of the victim's death. Dr. Panella, for example, opined that there could be other reasons why the semen was in these particular locations, including (1) semen could have been deposited during sexual encounters prior to the night of the victim's death, (2) semen could have been transferred to these locations at

_____

[5] President Judge Panella does not know nor is he related to Dr. Michael Panella.

other times from other bedding, and (3) "there is also a possibility that when articles have, are washed . . . the semen, the sperm can actually lift off the contaminated garments that are being washed and deposit on the other pieces of the garments that have not been stained and then, now they are contaminated with sperm."  N.T. Trial, 11/19/13, at 38-39.  **Counsel for Appellant did not ask either expert, however, whether Dr. Wecht's methodology was generally accepted in the scientific community.**

During closing arguments, the Commonwealth relied heavily on Dr. Wecht's testimony:

> Now, you heard a lot from experts, and our expert, of course, was Dr. Wecht, who you heard testify, who told you, in his opinion— this wasn't just coming out of nowhere, as has been suggested. His opinions were based on his experience, and it was based upon a reasonable degree of forensic pathological certainty.  He applied his 52 years of experience to this case. Dr. Wecht has seen it all, 340 autopsies this year alone, a medical practice going back 52 years.

N.T. Trial, 11/21/13, at 87.  The Commonwealth continued:

> Use your common sense, because when [Dr. Wecht] says that [Appellant is] on top of Janet Walsh when he kills her, that is evident, and then stop right there.  What does that do?  Right in her mid back is a spot where [Appellant's] seminal fluid is found, and . . . when you have that the rope around her hands is right here, the knot on the ligature is going to be right there, right there (indicating), and it all lines up.  It all lines up to the person who Dr. Wecht says was right on top of her and ejaculates on her back while holding that ligature.  Dr. Wecht also told us that to believe that the last time [Appellant] was at her house was three or four weeks before, and the way that she's found, and where the seminal fluid is, and knowing that, how he knew she was, that you would have to believe . . . that someone else somehow came into her apartment, killed her, left her with seminal fluid in those exact locations, tied her up like that, and left and wasn't found, nothing

- 14 -

but truth. You see what I'm saying? She is found that way, and to believe that someone else came in there, left her in that position in the exact area where the seminal fluid is, and no one else left a trace, no other person, no other person on the gown or on that ligature, so you would have to believe that someone else came there and then left her the way she was, naked from the waist down, and that's how she was, and that somehow, after three or four weeks had passed, she's in that exact same position with somebody else, that, ladies and gentlemen, is impossible. It's hard to believe that that seminal fluid somehow was cross contaminated onto the robe, the gown, and the sheet, and then found as we saw. That is absurd. Just like Dr. Wecht said, we would have to believe in an absurdity. That seminal fluid was deposited at the time of her death. That seminal fluid was left on her exactly in that spot on that robe as he straddled over her at the time he strangled her, because we know that she was being strangled from behind because of the ligature marks, the ligature. That seminal fluid was deposited at the marks on her neck and where that knot is, is where that fluid is, and [Appellant] cannot be excluded from it.

*Id.* at 95-97. "Science," the Commonwealth argued, "caught up to [Appellant]." *Id.* at 98.

On November 22, 2013, the jury found Appellant guilty of third-degree murder. On February 26, 2014, the trial court sentenced Appellant to eight to sixteen years' imprisonment with credit for time served from January 29, 2012 until December 4, 2012 and from November 22, 2013 until the date of sentence. Appellant filed timely post-sentence motions, which the trial court denied, and a timely direct appeal. The trial court issued an opinion rejecting Appellant's challenge to the sufficiency of the evidence:

It was . . . determined by Crime Lab [that] the semen found on the nightgown top, robe tie around the victim's wrists, and flat sheet covering the victim matched [Appellant's] DNA. . . . Furthermore, the only semen found on the nightgown top and robe tie matched [Appellant]. Given the location of the semen on

- 15 -

the bedsheet that covered most of the victim's body, and the fact that [Appellant's] semen was also found on the nightgown and the robe tie binding her hands behind her back, the Commonwealth proved beyond a reasonable doubt that [Appellant] was the perpetrator and killed the victim with malice.

Trial Court Opinion, 8/26/14, at 70.

On direct appeal, Appellant challenged the sufficiency and weight of the evidence and argued that the trial court erred by refusing to sustain his Fourth Amendment objection to the seizure of his discarded drinking cup. On August 31, 2015, a panel of this Court affirmed his judgment of sentence. *See Commonwealth v. Hopkins*, 964 WDA 2014, unpublished memorandum at 5 (Pa. Super. filed August 31, 2015). On July 22, 2016, the Supreme Court denied Appellant's petition for allowance of appeal.

On June 21, 2017, Appellant filed a timely PCRA petition alleging, *inter alia*, that trial counsel was ineffective for failing to request exclusion of Dr. Wecht's "topographical distribution" opinion under *Frye* on the ground that his methodology was not generally accepted in the scientific community. On December 5, 2017, the PCRA court convened an evidentiary hearing on Appellant's petition. Appellant presented the testimony of Dr. David Fowler, the chairperson and former President of the National Association of Medical Examiners, and Dr. Kimberly Collins, the incoming President of the National Association of Medical Examiners. The court found both witnesses qualified as experts in forensic pathology.

Counsel asked Dr. Fowler whether the science of forensic pathology generally accepts "topographical distribution" as a methodology from which Dr. Wecht could date a deposit of Appellant's DNA. N.T. PCRA Hearing, 12/5/17, at 14. Dr. Fowler answered, "No, that's not medical science." *Id.* When asked whether he ever heard of a forensic pathologist attempting to date a DNA deposit based on topographical distribution, Dr. Fowler answered, "No, this would be a first for me." *Id.* Dr. Fowler confirmed that there are no standards, no studies, no tests, and no generally accepted methodology in the field of forensic science to determine the date of a seminal DNA deposit. *Id.* at 15. He concluded that Dr. Wecht's opinion was not rooted in the science of forensic pathology, and that no forensic pathologist is capable of opining the date of deposit of seminal DNA. *Id.* at 16; *see also id.* at 23 (topographical distribution is "not something that forensic pathologists typically do. It's outside the national practice standards").

Similarly, PCRA counsel asked Dr. Collins "[whether] the science of forensic pathology properly allow[s] for the types of conclusions that Dr. Wecht rendered in this case." Dr. Collins answered, "None whatsoever, not only pathology, but not scientifically." *Id.* at 34. Dr. Collins confirmed that "not only is [topographical distribution] not a methodology, I've never even heard or used that terminology in forensic pathology." *Id.* at 35. When asked if there is any methodology for the dating of a DNA deposit, she answered, "[N]one whatsoever." *Id.* When asked if she ever heard of dating based upon

- 17 -

the topographical distribution of samples, she said that she has never heard of it "because it is impossible." *Id.* Nor had she heard of a single study that has evaluated whether "topographical distribution" is a valid scientific method for dating the deposit of DNA. *Id.* at 35-36. When asked whether there is a generally accepted methodology in the field of forensic science, or in any field of science, from which to draw Dr. Wecht's opinions, she answered, "[N]o." *Id.* at 36. When PCRA counsel asked if Dr. Wecht's testimony was outside the bounds of proper forensic pathology, she stated, "[M]ost definitely." *Id.*

Trial counsel for Appellant was the next witness. He admitted that Dr. Wecht's testimony was "one of the pivotal issues" in the case and acknowledged filing a motion to preclude Dr. Wecht's testimony. *Id.* at 52. He admitted, however, that he did not seek preclusion under *Frye* on the ground that Dr. Wecht's methodology was not generally accepted in the relevant field. Specifically, trial counsel testified, "I didn't argue that specific point, but I did argue that it wasn't science. . . . I stated that it did not relate to a science, skill or occupation beyond the knowledge or experience of the average layman[.]" *Id.* at 53-54. Nor did trial counsel recall investigating whether "topographical distribution" was a generally accepted method used in the field of forensic pathology to date a DNA sample. *Id.* at 58 (trial counsel's admission that he did not recall discussing this subject with Dr. Panella).

Trial counsel contended that he thought he was "on such solid footing" on the issues he raised that he "didn't consider anything else." *Id.* at 60.

PCRA counsel inquired, "But if you would have known that topographical distribution was an invalid methodology to date DNA samples and that Dr. Wecht was testifying outside the realm of forensic science when he rendered those opinions, you would have raised that as an issue, is that correct[?]" *Id.* at 60-61. Trial counsel answered, "I can't tell you that for sure from this standpoint. I could have raised it in the alternative if I had known at that point in time what you're saying to be true. I don't know whether it's true or not." *Id.* at 61. PCRA counsel asked, "And you just didn't know anything more about topographical distribution sufficient to raise it at that point?" *Id.* at 62. Trial counsel answered, "It wasn't something that we explored, no." *Id.*

Dr. Wecht did not testify at the PCRA hearing. The Commonwealth did not present any expert testimony in response to Drs. Fowler and Collins.

On June 7, 2018, the court denied PCRA relief on the ground that Dr. Wecht's opinion was not subject to *Frye* because it was not "scientific" testimony. The trial court held "[Dr. Wecht's opinion] regarding the use of scientific evidence to adduce the time and intentional nature of the incident, which is unsupported by scientific methods or theory, is not subject to a *Frye* analysis as such testimony is not scientific testimony but merely opinion testimony that is improper for an expert to provide when testifying as an expert." PCRA Court Opinion, 6/7/18 at 7. Appellant filed a timely notice of appeal, and both Appellant and the court complied with Pa.R.A.P. 1925.

In this Court, Appellant raises three issues:

1. Whether trial counsel was ineffective for failing to request the Court conduct a *Frye* hearing, to investigate and call available expert witnesses at such a hearing and to object based on Rule 702(c) of the Pennsylvania Rules of Evidence to the testimony of Dr. Cyril Wecht, that based on "topographical distribution," he could render an expert, scientific opinion that [Appellant's] DNA was placed on the victim's clothing and bed sheet the morning of her homicide?

2. Whether trial counsel was ineffective for failing to properly examine witnesses and to explain to the jury the factual insignificance of the "4+" rating assigned by the Pennsylvania State Police Crime Lab to [Appellant's] seminal deposits?

3. Whether the Trial Court erred in refusing to order the Commonwealth to produce the microscopic slides, the identity of the stain used to mark the slides and the protocol used to derive the "4+" rating for examination by [Appellant's] expert in conjunction with her PCRA hearing testimony?

Appellant's Brief at 4. We find Appellant's first issue that trial counsel was ineffective for failing to seek preclusion of Dr. Wecht's testimony under *Frye* entitles him to PCRA relief, and therefore we find no need to address any remaining issues.

## II. *Frye* and Expert Testimony under Pennsylvania Rule of Evidence 702.

In 1977, our Supreme Court adopted *Frye* in *Topa*, *supra*, and it has remained in force since that time. Under *Frye*, "novel scientific evidence is admissible if the methodology underlying the evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1043-44 (Pa. 2003). The requirement of general acceptance in the scientific community

assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

*Topa*, 369 A.2d at 1282.

When first adopted in 1998, the Pennsylvania Rules of Evidence did not expressly incorporate *Frye*. As initially adopted, Pa.R.E. 702, the rule governing the admission of expert testimony, provided:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702 (1998 version). Although Rule 702 as originally adopted was silent with regard to *Frye*, the comment to that rule explained that *Frye* continued to remain in force. *See* Pa.R.E. 702, Explanatory Comment—1998 ("[a]doption of Pa.R.E. 702 did not alter Pennsylvania's adoption of the standard in [*Frye*], which requires scientific evidence to have 'general acceptance' in the relevant scientific community").

In 2003, the Pennsylvania Supreme Court granted review in *Grady* to consider whether to replace *Frye* with the standard adopted in federal courts

- 21 -

in **_Daubert v. Merrell Dow Pharmaceuticals, Inc._**, 509 U.S. 579 (1993).[6]

The **_Grady_** court opted to retain **_Frye_** and reject **_Daubert_**, reasoning:

> **_Frye's_** "general acceptance" test is a proven and workable rule, which when faithfully followed, fairly serves its purpose of assisting the courts in determining when scientific evidence is reliable and should be admitted.
>
> One of the primary reasons we embraced the **_Frye_** test in **_Topa_** was its assurance that judges would be guided by scientists when assessing the reliability of a scientific method. *See* **_Topa_**, 369 A.2d at 1281 (quoting **_United States v. Addison_**, 498 F.2d 741, 744 (D.C.Cir.1974)). Given the ever-increasing complexity of scientific advances, this assurance is at least as compelling today as it was in 1977, when we decided that case. We believe now, as we did then, that requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the **_Frye_** rule requires, is the better way of insuring that only reliable expert scientific evidence is admitted at trial.

**_Grady_**, 839 A.2d at 1045.

Effective March 18, 2013, eight months before Appellant's trial, the Court amended Rule 702 to provide as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

---

[6] **_Daubert_** abandoned **_Frye's_** "general acceptance" requirement in favor of a test under which the trial judge evaluates whether the evidence will assist the trier of fact, and whether the evidence is reliable and scientifically valid. **_Id._**, 509 U.S. at 592.

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; **and**

**(c) the expert's methodology is generally accepted in the relevant field.**

*Id.* (emphasis added).  Through the addition of subsection (c), the Court expressly incorporated *Frye* into Rule 702.[7]  Amended Rule 702 remains in effect today.

The inclusion of "and" at the end of Rule 702(b) demonstrates that the proponent of expert testimony must satisfy all three subsections of the rule, including subsection (c), in order for expert opinion testimony to be admissible.  *Commonwealth v. Walker*, 92 A.3d 766, 789 (Pa. 2014) ("to be admissible under Rule 702, evidence must not only be beyond the knowledge possessed by [a] layperson, and assist the trier of fact to understand the evidence, but it also . . . must pass the *Frye* 'general acceptance' test").  Appellant's current appeal asserts that trial counsel was ineffective for failure to object to the testimony of Dr. Wecht on the basis that the methodology ostensibly relied upon by Dr. Wecht, "topographical distribution," failed to meet the requirements of Rule 702(c).

---

[7] For purposes of this opinion, since Rule 702(c) embodies *Frye*, we refer to both "Rule 702(c)" and *Frye* interchangeably and treat them as synonymous.

## III. Not Previously Litigated or Waived

Before examining the merits of Appellant's *Frye* argument, we consider whether it is barred as previously litigated or waived. PCRA petitioners must plead and prove that an allegation of error has not been previously litigated. 42 Pa.C.S.A. § 9543(a)(3). An issue has been "previously litigated" when either "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue," 42 Pa.C.S.A. § 9544(a)(2), or "it has been raised and decided in a proceeding collaterally attacking the conviction or sentence." 42 Pa.C.S.A. § 9544(a)(3). Additionally, an issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S.A. § 9544(b).

Appellant's *Frye* issue was not previously litigated under Section 9544(a)(3), because there have been no prior collateral proceedings in this case, and defense counsel did not raise *Frye* during pretrial or trial proceedings.

Nor was this issue previously litigated under Section 9544(a)(2). This subsection focuses not on what the PCRA petitioner raised or could have raised, but on whether the "highest appellate court in which the petitioner could have had review as a matter of right" ruled on the merits of the issue in question. In non-capital cases such as this, the Superior Court is the highest appellate court in which Appellant could have had review as a matter of right.

- 24 -

*See* 42 Pa.C.S.A. § 722 (defining classes of cases in which parties have right of direct appeal to Supreme Court), and § 742 ("[t]he Superior Court shall have exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas . . . except such classes of appeals as are by any provision of this chapter within the exclusive jurisdiction of the Supreme Court or the Commonwealth Court"). In the Commonwealth's pretrial appeal at 1776 WDA 2012, it argued only that the trial court erred by excluding Dr. Wecht's testimony under Pa.R.E. 702(a) and (b). It did not argue that Dr. Wecht's methodology satisfied *Frye*. In reversing the trial court, we held that Dr. Wecht "assert[ed] facts not generally known but known to him because of his special training and experience" and that he stated his opinion "with the requisite degree of certainty," *Hopkins*, 1776 WDA 2012, at 6-7. We did not, however, address whether his methodology was generally accepted in the field of forensic pathology, a requirement under Pennsylvania law since *Topa's* issuance in 1977. We likewise did not address *Frye* in Appellant's direct appeal following his conviction. We simply rejected Appellant's challenges to the sufficiency and weight of the evidence and his Fourth Amendment argument concerning the seizure of his drinking cup.

Lastly, Appellant has not waived his *Frye* argument, because he raised it in a timely PCRA petition alleging ineffective assistance of counsel. *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002) (in general, petitioners must wait to raise claims of ineffective assistance of trial counsel

until collateral review; ineffectiveness claims are waived only after petitioner has had the opportunity to raise that claim on collateral review and has failed to avail himself of that opportunity).

Accordingly, we proceed to the merits of Appellant's *Frye* argument.

## IV. Ineffective Assistance Standards

To obtain relief on a claim of ineffective assistance of counsel, Appellant must prove that: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his actions or failure to act; and (3) the petitioner was prejudiced by counsel's deficient performance such that there is a reasonable probability that the result of the proceeding would have been different absent counsel's error or omission. *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987). Counsel is presumed to have rendered effective assistance. *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117 (Pa. 2012).

When reviewing a PCRA order, we examine whether the record supports the PCRA court's factual findings and whether its legal conclusions are free from error. *Commonwealth v. Hannibal*, 156 A.3d 197, 206 (Pa. 2016). We view the PCRA court's findings and evidence of record in the light most favorable to the prevailing party. *Commonwealth v. Koehler*, 36 A.3d 121, 131 (Pa. 2012). The PCRA court's credibility determinations, when supported by the record, are binding, but we review the PCRA court's legal conclusions *de novo*. *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013). The petitioner has the burden of persuading us that the PCRA court erred and that

such error requires relief. ***Commonwealth v. Wholaver***, 177 A.3d 136, 144-45 (Pa. 2018).

### a) Arguable Merit

Appellant argues that trial counsel was ineffective for failing to raise a ***Frye*** objection to Dr. Wecht's testimony. We hold that this claim has merit because Dr. Wecht's methodology, "topographical distribution," was "novel" science not generally accepted in the field of forensic pathology.

"***Frye***, by definition, only applies where expert testimony is required." ***Trach v. Fellin***, 817 A.2d 1102, 1108 (Pa. Super. 2003) (*en banc*). ***Frye*** precludes expert testimony when the expert's methodology (1) is "novel science" and (2) is not generally accepted in the relevant field. ***Id.*** at 1110. "[S]ince ***Frye*** is an exclusionary rule of evidence, it must be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." ***Walsh v. BASF Corporation***, 191 A.3d 838, 848 (Pa. Super. 2018). ***Frye*** does not examine whether the expert's conclusions are valid, but simply evaluates whether he used valid methods to reach his conclusions. ***Trach***, 817 A.2d at 1112.

> "Scientific" methodology is based on
>
> generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry. . . . Stated differently, the scientific method is a method of research in which a problem is identified, relevant data are gathered, a hypothesis is formulated from these data, and the hypothesis is empirically tested. Within the meaning of the definition of the scientific method, empirical means provable or verifiable by experience or experiment. Key

aspects of the scientific method include the ability to test or verify a scientific experiment by a parallel experiment or other standard of comparison (control) and to replicate the experiment to expose or reduce error.

*Id.* at 1113 (citations and quotations omitted).

"Novel" scientific evidence

is usually decided on a case-by-case basis as there is some flexibility in the construction, as science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination. . . . Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Walker*, 92 A.3d at 790 (citations and quotations omitted).

When an expert presents novel scientific evidence, *Frye* requires analysis of whether the methodology underlying the expert's opinion is generally accepted in the relevant scientific community. "General acceptance" does not require universal acceptance of a given methodology. *Commonwealth v. Blasioli*, 713 A.2d 1117, 1126-27 (Pa. 1998). Courts accept a variety of sources as evidence that the expert's methodology is generally accepted, including judicial opinions, *Walker*, 92 A.3d at 782-84; *Commonwealth v. Nevels*, 203 A.3d 229, 238-39 (Pa. Super. 2019), scientific publications, studies, and statistics, *Blasioli*, 713 A.2d at 1126-27, expert testimony, *id.*, or a combination of the above. An expert need not rely

on studies that mirror the exact facts under consideration. *Walsh*, 191 A.3d at 848. It is sufficient if the synthesis of various legitimate studies reasonably permits the conclusion reached by the expert. *Id.* The absence of a treatise or study directly on point goes to the weight, not the admissibility, of the opinion. *Id.* Conversely, an expert's personal belief, standing alone, is not sufficient proof that his methodology is generally accepted. In *Snizavich v. Rohm & Haas Company*, 83 A.3d 191 (Pa. Super. 2013), we stated:

> The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. **When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief**[.]

*Id.* at 197 (citation omitted) (emphasis added).

The PCRA court rejected Appellant's *Frye* argument by declaring that *Frye* applies only to novel "**scientific**" methodology, whereas Dr. Wecht's methodology was **non-scientific**, that is, it rested on "unscientific conjecture and speculation" that "every layperson uses." PCRA Court Opinion, 6/7/18, at 20-21. During the PCRA hearing, one of Appellant's experts, Dr. Fowler, testified that Dr. Wecht's opinion was "not medical science." N.T. PCRA Hearing, 12/5/17, at 14. Seizing upon these words, the PCRA court wrote:

> Had Dr. Wecht proposed to utilize some new method or technique to determine the date of the seminal DNA deposit . . . such novel methods would have been a prime instance of the necessity for a *Frye* hearing to determine the efficacy and general acceptance of this novel scientific methodology. In this case, however, such a novel method was not employed by Dr. Wecht. Rather, Dr. Wecht utilized accepted methods of DNA analysis to establish the presence of [Appellant's] DNA at the scene, and then engaged in unscientific conjecture and speculation based on the locations of the DNA to opine to the likely time that the DNA was deposited. In other words, Dr. Wecht's methodology, if one could call it that, was not scientific methodology: he employed no tests nor were measurements taken, only physical observation and speculation. If this can be described as a methodology, it cannot be described as scientific methodology, but rather the methodology every layperson uses when engaging in speculation, which is to say—as was said by trial counsel, his experts, and even PCRA counsel and his experts—it is not science at all.

PCRA Court Opinion, 6/7/18, at 20-21. As it did in its pretrial opinion, the court signaled its doubt about the quality of Dr. Wecht's opinion. Despite its skepticism, the court concluded that Rule 702(c) applies only when an expert presents a "scientific" opinion based on methodology that is not generally accepted in the relevant field. Since Dr. Wecht's opinion was non-scientific, the court said, Rule 702(c) did not apply, and he was free to base his opinion on speculation instead of generally accepted methodology.

The record is clear that Dr. Wecht failed to use scientific methodology but instead resorted to offering his opinions based upon what he surmised from the physical evidence. Nevertheless, Rule 702(c) applied to his testimony because he **purported** to present a novel scientific opinion to the jury.

There was no generally accepted methodology underlying Dr. Wecht's "topographical distribution" testimony. Dr. Wecht failed to cite any tests or studies demonstrating that "topographical distribution" is a valid forensic tool for identifying the time DNA is deposited. In fact, he admitted that he could not date the deposit of DNA based upon locations where it was identified, and acknowledged that no test exists for dating DNA deposits. During the PCRA hearing, Drs. Fowler and Collins gave unrebutted testimony that "topographical distribution" is not generally accepted in the field of forensic pathology. They stated unequivocally that there are no standards, studies, tests or generally accepted methodology in the field of forensic science to determine the date of a seminal DNA deposit. The Commonwealth did not present any testimony to rebut this testimony, or cite to any judicial decision that accepts "topographical distribution" as a valid method for identifying the time of DNA deposits. Nor have we found any such decision ourselves. The term "topographical distribution" is an impressive sounding label, but there is simply no methodology to support it.

Dr. Wecht also failed to provide any generally accepted methodology in support of his contention that Appellant did not deposit any of the seminal fluid during intercourse with Walsh three to four weeks before her death. Dr. Wecht merely suggested that as a 23-year-old who worked and had a social life, the victim would have washed these items during the last month of her life. There was no evidence about the victim's social life except that she was

in the process of divorcing her husband, had a casual sexual relationship with Appellant, and went out dancing with friends the night before her death. Nor was there any evidence about when she last washed her clothes or sheets before her death. There were no standards, empirical data or studies undergirding Dr. Wecht's statement. It was simply his own personal opinion based upon his review of the physical evidence.

The question becomes whether Dr. Wecht's opinion fell outside of Rule 702(c)'s purview because it was "non-scientific." We think not. Dr. Wecht presented a novel opinion to the jury that **purported** to be scientific. Since he portrayed his opinion as scientific, Rule 702(c) required him to support his opinion with generally accepted methodology. He failed to do so.

The Commonwealth's central theme during trial was that it solved a cold case, and brought a killer to justice, through science. To promote this thesis, Dr. Wecht, a renowned expert in forensic pathology, presented a novel topographical distribution theory—an opinion so novel that neither of Appellant's experts ever heard of it—and stated repeatedly that it was within a reasonable degree of "scientific" certainty. N.T. Trial, 11/13/13, at 183, 220. During closing arguments, the Commonwealth emphasized that "our expert," Dr. Wecht, who has "seen it all" during his 52 years of medical practice, established to "a reasonable degree of forensic pathological certainty" that Appellant deposited the seminal fluid on the night of Walsh's death. N.T. Trial, 11//21/13, at 87. "Science," the Commonwealth concluded,

"caught up to [Appellant]." *Id.* at 98. In our view, the requirement that novel scientific opinions rest upon generally accepted methodology extends to novel opinions that **purport** to be scientific. Otherwise, juries will be exposed to opinions that masquerade as science but which rest on nothing more than personal belief—the very type of methodology that we cautioned against in *Snizavich*. *Id.*, 83 A.3d at 197. Therefore, Rule 702(c) required Dr. Wecht to back up his novel, and purportedly scientific, opinion with methodology generally accepted in the field of forensic pathology.

Implicit in Dr. Wecht's testimony is the suggestion that common sense is a valid substitute for scientific methodology, and as a matter of common sense, the three areas of sperm at the crime scene must have been deposited at the same time. *Frye*, however, requires experts to support their opinions with generally accepted methodology, not simply with common sense. If common sense alone were permissible, no need would exist for expert testimony; a lay witness could testify instead. Of equal importance, common sense is insufficient in this case, because it does not rule out the possibility that the deposits could have occurred during one or more prior sexual encounters in the summer of 1979. Nor does scientific methodology rule out this possibility, because as discussed above, scientific methodology provides no help at all in determining whether the deposits took place on the night of Walsh's death or on some earlier date(s).

We conclude that Dr. Wecht's opinion testimony does not satisfy ***Frye*** because it is not supported by any generally accepted methodology. Instead, we find the opinion testimony admitted is the type of opinion ***Frye*** is intended to preclude. The PCRA court confirmed the deficiencies in Dr. Wecht's methodology by stating, "If this can be described as a methodology, it [was] the methodology every layperson uses when engaging in speculation." PCRA Court Opinion, 6/7/18, at 21. Accordingly, Appellant's claim that trial counsel was ineffective for failing to raise a ***Frye*** objection to Dr. Wecht's testimony has arguable merit.

### b) Reasonable Basis for Counsel's Inaction

"With regard to reasonable basis, the PCRA court does not question whether there were other more logical courses of action which counsel could have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis." ***Commonwealth v. Mason***, 130 A.3d 601, 618 (Pa. 2015) (citation and punctuation omitted). "Where matters of strategy and tactics are concerned, [a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." ***Id.*** (citations and punctuation omitted).

Counsel's decision to refrain from a particular action does not constitute ineffectiveness if it arises from a reasonable conclusion that there will be no benefit and is not "the result of sloth or ignorance of available alternatives."

*Commonwealth v. Collins*, 545 A.2d 882, 886 (Pa. 1988). In *Collins*, the defendant was convicted of aggravated assault for firing a shotgun at the victim, Barfield. The defendant argued that trial counsel provided ineffective assistance by failing to cross-examine Barfield as to her bias against the defendant. The defendant claimed Barfield was biased because a few years earlier, her son had been convicted for the shooting death of the defendant's cousin based on the testimony of the defendant's brother. The Supreme Court held that trial counsel had a reasonable basis not to bring out Barfield's bias:

> [T]rial counsel fully considered the tactic of impeaching [] Barfield according to a theory of revenge-rooted bias, but rejected that approach as being more harmful than beneficial to the defendant's position. [I]t was trial counsel's judgment that the very same circumstances which might have infused [] Barfield with an appetite for vengeance could have had the same effect on the defendant, and could have given him a motive for perpetrating the shotgun attack. Although the prosecution did not have to establish motive, such would be relevant and further evidence of guilt. In light of those considerations, trial counsel took the approach that [] Barfield was an honest and sincere person but who was mistaken in her identification of the shooter. To reinforce that position, and in conjunction with it, counsel sought to prove that her client was elsewhere at the time of the shooting.

*Id.* (citation omitted).

Here, PCRA counsel asked trial counsel whether he considered filing a *Frye* motion to preclude Dr. Wecht's testimony for lack of generally accepted methodology. Trial counsel answered that he objected to Dr. Wecht's opinion on the ground that it did not "relate to a science, skill or occupation beyond the knowledge or experience of the average layman," *i.e.*, a Rule 702(a) objection. N.T. PCRA Hearing, 12/5/17, at 53-54. Trial counsel admitted that

he did not consider a *Frye* motion under Rule 702(c) because he thought he was "on such solid footing" with his Rule 702(a) objection. *Id.* at 60. Thus, unlike defense counsel in *Collins*, trial counsel did not have a reasonable excuse for failing to raise a *Frye* objection. He simply failed to consider *Frye* at all.

A *Frye* motion under Rule 702(c) would not have impaired the Rule 702(a) motion that counsel prosecuted. Instead, a Rule 702(c) motion challenging Dr. Wecht's methodology would have been a natural companion to the Rule 702(a) motion. *See Commonwealth v. Boykin*, 461 A.2d 1101, 1102 (Pa. 1983) (counsel had no reasonable basis not to request severance of defendant's trial from co-defendants, where "[defendant's] case may have benefited substantially from severance and because making such a motion [did] not eliminate or put at risk any available alternative"); *cf. People v. Wilson*, 164 A.D.3d 1012, 1020 (N.Y. App. Div. 2018) (no reasonable basis existed for trial counsel's failure to request *Frye* hearing to exclude state's expert, where expert's computer program that used mathematics and statistics to analyze DNA data was novel science, expert provided the only definitive DNA analysis connecting defendant to the crimes against victim, and state's case would have been weakened had expert's opinion been found unreliable after *Frye* hearing).

### c) Prejudice

A PCRA petitioner establishes prejudice by demonstrating that "counsel's chosen course of action had an adverse effect on the outcome of the proceedings." *Commonwealth v. Chambers*, 807 A.2d 872, 883 (Pa. 2002). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

In our opinion, trial counsel's failure to lodge a *Frye* objection to Dr. Wecht's testimony deprived Appellant of a fair trial. Dr. Wecht's testimony was essential to the Commonwealth's case, a fact the Commonwealth admitted by certifying in its pretrial appeal that the order precluding Dr. Wecht's testimony substantially handicapped its case. A reasonable probability exists that the Commonwealth would not have obtained a guilty verdict without Dr. Wecht's testimony. The Commonwealth accused Appellant of strangling Walsh to death from behind in her apartment on September 1, 1979. Police detectives did not find any signs of semen on Walsh's body, her nightgown, on the top sheet or the fitted sheet from the bed, on the tie that bound her hands, or on the ligature. Appellant admitted having sexual intercourse with Walsh in her apartment several times earlier in the summer, but he asserted he was in another residence several miles away on the

morning of Walsh's death. Over thirty years later, the State Police found Appellant's seminal DNA on the top sheet that covered Walsh's body, the belt tied around her hands, and her nightgown. Dr. Wecht testified that the "topographical distribution" of these three areas of sperm positioned Appellant on top of Walsh's back at the time of her death. No other witness testified as to the significance of the seminal fluid locations as they related to the time of Walsh's death. Indeed, every forensic expert who testified during trial—including Dr. Wecht at certain points in his testimony—conceded that it is impossible to date DNA samples. Without Dr. Wecht's topographical distribution testimony, the Commonwealth had no other evidence purporting to prove that the DNA deposits took place around the time of Walsh's death. In view of Appellant's sexual relationship with Walsh, the jury might well have concluded that, but for Dr. Wecht's testimony, the DNA deposits occurred during one or more sexual episodes earlier in the summer. Only through his testimony was the Commonwealth able to persuade the jury that Appellant was the murderer.

Our Supreme Court cautioned in **Topa** that "scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen." **Id.**, 369 A.2d at 1282. Further, as now-Chief Justice Saylor once observed:

> Expert witnesses can have an extremely prejudicial impact on the jury, in part because of the way in which the jury perceives a witness labeled as an expert. To the jury an "expert" is just an unbridled authority figure, and as such he or she is more

> believable.  A witness who has been admitted by the trial court as an expert often appears inherently more credible to the jury than does a lay witness. . . . Added to the potentially prejudicial influence of the term expert is the difficulty inherent in evaluating scientific evidence.

*Commonwealth v. Smith*, 995 A.2d 1143, 1177 n.4 (Pa. 2010) (Saylor, J., concurring and dissenting) (citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 553 (Tex.1995)).  Our review convinces us that the testimony of Dr. Wecht—whom the Commonwealth presented as a witness who had "seen it all" and therefore was the ultimate voice of authority on forensic pathology—prejudiced Appellant in the manner cautioned against in *Topa* and *Smith*.

## V.  Conclusion

Our analysis leads us to conclude that the PCRA court erred in denying Appellant relief.  We do not reach this decision lightly.  This case involves a heinous crime that snuffed out the life of a young and blameless woman.  Decades after the victim's death, the Commonwealth went to considerable lengths to solve the crime with cutting-edge technology.  A renowned forensic pathologist, Dr. Wecht, presented expert testimony on behalf of the Commonwealth that, on the surface, appeared to pinpoint Appellant as the wrongdoer.

Nevertheless, the record establishes that the verdict was the product of ineffective assistance of trial counsel.  Although Dr. Wecht's testimony was not supported by generally accepted methodology, trial counsel failed to move

to exclude Dr. Wecht's testimony under *Frye*. Counsel did not have a reasonable excuse for failing to take this step; he simply neglected to consider it. Dr. Wecht's testimony prejudiced Appellant by serving as the centerpiece of the Commonwealth's case. The jury likely found Appellant guilty because Dr. Wecht's status as an expert added luster to his theory of "topographical distribution." We believe that there is a reasonable probability the outcome of this case may well have been different had trial counsel moved to preclude Dr. Wecht's testimony under *Frye*. For these reasons, we reverse the order denying PCRA relief and remand for a new trial in which expert testimony concerning "topographical distribution" shall not be admissible.

Order reversed. Case remanded for further proceedings in accordance with this opinion. Jurisdiction relinquished.

President Judge Panella joins the opinion.

Judge McLaughlin concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/6/2020