J-A19016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ETHAN W. RIPPEY | : | |
| | : | |
| Appellant | : | No. 1327 MDA 2021 |

Appeal from the PCRA Order Entered September 21, 2021
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0001230-2017

BEFORE:    BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED: DECEMBER 19, 2022**

Appellant, Ethan W. Rippey, appeals from the order entered in the York County Court of Common Pleas, which dismissed his first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

A prior panel of this Court set forth the relevant facts and procedural history of this appeal as follows:

> On August 21, 2016, K.H. ("the victim") and Appellant, both college students, were drinking at a college party in York when Appellant invited [the victim] and others over to his house.  Appellant and the victim went alone to the house to play beer pong.  They kissed a bit, and then toured the house, ending up in Appellant's bedroom.  They kissed some more and Appellant digitally penetrated the victim's vagina.  When the penetration became rough, however, the victim asked him to stop.  He did not stop, and she pushed him

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

away. Appellant then grabbed her and forced his penis into her mouth. Although the victim pushed him away again, and continually said "no," Appellant pushed her onto his bed, strangled her, and anally and vaginally raped her. After Appellant climaxed, he called the victim a "dirty little slut" as she ran crying out of the house and back to the party. Her friends took her to the York Hospital where a forensic nurse conducted a SAFE rape examination. One week later, the victim reported the incident to the college's campus security and eventually she reported it to the York City Police Department.

The Commonwealth charged Appellant with [rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, sexual assault, and simple assault]. Prior to trial, Appellant filed a Motion *in limine*, requesting, among other things, that the court preclude the Commonwealth's sexual assault forensic expert from testifying that the victim's injuries were consistent with "non-consensual sex." The court granted the Motion, in part, and precluded the expert from using the phrase "consistent with non-consensual sex." The court noted, without objection from Appellant, that the expert would be allowed to opine on whether the injuries were caused by force.

At Appellant's three-day jury trial, the Commonwealth presented the testimony of the victim, the SAFE nurse examiner, and the sexual assault forensic expert, among others. The victim testified regarding the evening of the rape and her extensive physical and psychological injuries. On cross examination, she testified that she had had one prior incident with Appellant in the spring of 2016 where all she remembered was drinking and playing video games with Appellant and two others before waking up bent over Appellant's bed with Appellant standing behind her pulling up his pants, and her crying because she did not know what had occurred. She also recalled that she was bleeding anally later that evening.

The nurse examiner testified regarding the extensive injuries to the victim's body, stating that of 270 SAFE rape examinations she had conducted, the examination of the victim revealed the most injuries she had ever had to

document. She stated that the victim had numerous lacerations, abrasions, and bruises in her vagina and anus, including a large laceration in the victim's anus "caused by blunt force trauma." The nurse also testified that she was unable to conduct a full internal examination because the victim was in too much pain.

The sexual assault expert testified that she reviewed the victim's medical chart and opined that the lacerations the victim received on August 21, 2016, resulted from "blunt force trauma," and were "consistent with force."

Appellant testified that the August 2016 encounter was consensual rough sex, and stated "it takes two to tango." When counsel acknowledged that Appellant had been in the courtroom throughout all of the testimony presented by the Commonwealth, Appellant responded, "Yeah. I've missed a lot of class because of it."

The jury convicted Appellant of the above charges. The court ordered a presentence investigation ("PSI"), and the Sexual Offenders Assessment Board ("SOAB") evaluated Appellant. The court held Appellant's sentencing hearing on February 20, 2019. The Commonwealth presented a statement from the victim and her aunt. A few of Appellant's friends and family members presented statements, and the court acknowledged that Appellant had provided many letters of support from other friends and family members. The sentencing court noted its review of, *inter alia*, the PSI report, the SVP report, the victim's impact statement, and the many letters written on behalf of Appellant. The court also noted Appellant's prior record score of zero before it imposed a sentence of 7½ to 15 years' incarceration on the rape by forcible compulsion conviction, a consecutive term of 9½ to 19 years' incarceration on the IDSI by forcible compulsion conviction, and a concurrent term of 3 to 6 months' incarceration for the simple assault conviction, for an aggregate of 17 to 34 years' incarceration.

*Commonwealth v. Rippey*, No. 627 MDA 2019, unpublished memorandum at 1-2 (Pa.Super. filed March 20, 2020) (internal footnote and citations to the record omitted).

On March 20, 2020, this Court affirmed Appellant's judgment of sentence and Appellant did not seek further review with our Supreme Court. On December 3, 2020, Appellant filed a timely counseled PCRA petition. After holding an evidentiary hearing on May 21, 2021, the PCRA court denied Appellant's petition on September 21, 2021. Appellant filed a timely notice of appeal on October 14, 2021. On October 19, 2021, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal and Appellant complied on October 29, 2021.

Appellant raises the following issues for our review:

> Whether trial counsel was ineffective in failing to present character witnesses in a sexual assault case involving a consent defense where Appellant had no prior criminal convictions and nearly seventy people willing to testify to his excellent reputation for being a peaceful, law-abiding person.
>
> Whether trial counsel was ineffective in failing to object both 1) to the use of an expert witness to testify that the complainant's injuries occurred "by force" given that force was an element of the crime charged and this conclusion improperly usurped the role of the jury and 2) to the trial court's reminder to the jury during instructions that an expert had testified specifically regarding this element with respect to the Rape and IDSI charges.
>
> Whether trial counsel was ineffective in failing to object to the expert testimony that the injuries were the worst injuries that the expert had ever seen in a case such as this because any comparison to other cases was irrelevant, unfairly prejudicial, and amounted to the improper bolstering of the complainant's credibility.
>
> Whether trial counsel was ineffective in failing to challenge the requirement that [Appellant] register under [the Sexual Offender Registration and Notification Act ("SORNA")]

- 4 -

because the SORNA statute provides an unconstitutional, irrebuttable presumption that deprives [Appellant] of his right to reputation in this case where the Sex Offender Assessment Board found that Appellant was not a sexually violent predator, Appellant had no prior record, and nearly seventy people wrote letters on his behalf for sentencing.

(Appellant's Brief, at vii-viii).

In his issues combined, Appellant contends that trial counsel provided ineffective assistance at several points during the pendency of his trial. First, Appellant claims that trial counsel was aware that there were numerous people who were willing to testify to Appellant's good reputation in the community and Appellant had no prior convictions with which these witnesses could have been impeached. Appellant argues that trial counsel had no rational basis for failing to call character witnesses given that this case hinged on the credibility of Appellant's testimony that the sex was consensual and failure to do so critically impacted the outcome of his trial.

Second, Appellant asserts that trial counsel failed to object when the Commonwealth's sexual assault forensic expert testified that the victim's injuries occurred "by force" which effectively usurped the role of the jury because force is an element of two of the offenses at issue. Appellant maintains that trial counsel should also have objected when the court mentioned the expert's testimony regarding force during jury instructions and trial counsel's failure was unjustified and prejudicial.

Third, Appellant claims that trial counsel should have objected to the nurse examiner's testimony that the victim's injuries were the most that she

had ever seen. Appellant argues that such testimony was unfairly prejudicial to Appellant as Appellant had no way to challenge these assertions, and trial counsel had no basis for failing to object.

Finally, Appellant contends that trial counsel's failure to challenge Appellant's SORNA registration requirement was unreasonable where Appellant did not have a prior record and the Sex Offender Assessment Board did not deem Appellant a sexually violent predator. Appellant concludes that the PCRA court erred in finding that trial counsel provided effective assistance, and this Court should vacate the order denying his PCRA petition and grant him a new trial. We disagree.

"Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error." *Commonwealth v. Beatty*, 207 A.3d 957, 960-61 (Pa.Super. 2019), *appeal denied*, 655 Pa. 428, 218 A.3d 850 (2019). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). "[W]e review the court's legal conclusions *de novo*." *Commonwealth v. Prater*, 256 A.3d 1274, 1282 (Pa.Super. 2021), *appeal denied*, ___ Pa. ___, 268 A3.d 386 (2021).

"Counsel is presumed to have rendered effective assistance." *Commonwealth v. Hopkins*, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal*

- 6 -

*denied*, \_\_\_ Pa. \_\_\_, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111 (2011).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit[.]" *Commonwealth v. Smith*, 167 A.3d 782, 788 (Pa.Super. 2017), *appeal denied*, 645 Pa. 175, 179 A.3d 6 (2018) (quoting *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994)). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

"Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his

client's interests." ***Commonwealth v. Kelley***, 136 A.3d 1007, 1012 (Pa.Super. 2016) (quoting ***Pierce, supra*** at 524, 645 A.2d at 194-95).

> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

***Commonwealth v. King***, 259 A.3d 511, 520 (Pa.Super. 2021) (quoting ***Sandusky, supra*** at 1043-44).

"To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." ***Commonwealth v. Spotz***, 624 Pa. 4, 33-34, 84 A.3d 294, 312 (2014) (internal citations and quotation marks omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." ***Hopkins, supra*** at 876 (quoting ***Commonwealth v. Chambers***, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002)).

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements … by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to

testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

***Commonwealth v. Sneed***, 616 Pa. 1, 22-23, 45 A.3d 1096, 1108-09 (2012) (internal citations omitted).

"Failure to present available character witnesses may constitute ineffective assistance of counsel." ***Commonwealth v. Harris***, 785 A.2d 998, 1000 (Pa.Super. 2001), *appeal denied*, 577 Pa. 711, 847 A.2d 1279 (2004). "Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty." ***Id.*** "Counsel has a reasonable, strategic basis for not calling character witnesses if he has a legitimate reason to believe that the Commonwealth would cross-examine the witnesses concerning bad-character evidence." ***Commonwealth v. Hull***, 982 A.2d 1020, 1023 (Pa.Super. 2009).

Additionally, Rule 704 of the Pennsylvania Rules of Evidence states that expert opinion testimony "is not objectionable just because it embraces an ultimate issue." Pa.R.E. 704. Further, Section 5920 of the Judicial Code permits "qualified experts to testify in certain criminal proceedings about the dynamics of sexual violence, victim responses to sexual violence, and the impact of sexual violence on victims during and after being assaulted." ***Commonwealth v. Cramer***, 195 A.3d 594, 608 (Pa.Super. 2018); 42 Pa.C.S.A. § 5920(b)(1). However, the statute "specifically precludes an expert witness from opining on the credibility of any other witness, including

the victim." *Id.*; 42 Pa.C.S. § 5920(b)(3). The court must assess on a case-by-case basis whether an expert's testimony on this topic impermissibly invades the jury's province of determining credibility. *Commonwealth v. Jones*, ___ Pa. ___, ___, 240 A.3d 881, 897 (2020).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the PCRA court, we conclude Appellant's issues merit no relief. In its opinion, the PCRA court comprehensively discusses and properly disposes of the issues presented. (*See* PCRA Court Opinion, filed 9/21/21, at 2-33)

Regarding Appellant's claim of ineffective assistance based on failure to call character witnesses, the PCRA court determined that trial counsel had a reasonable basis for her decision because the Commonwealth was likely to cross-examine the proffered character witnesses about Appellant's admission that he had rough sex with the victim on a prior occasion while she was intoxicated, to rebut a claim of Appellant's peaceful nature. "By not calling character witnesses, of what she deemed minimal probative value, [trial counsel] eclipsed the opportunity of the Commonwealth to cross-examine them to [Appellant's] detriment, as they did at the PCRA hearing, by repeatedly highlighting his appetite for rough sex and anal sex to a jury of York Countians." (PCRA Court Opinion at 8). *See also Hull, supra*. Further, given the extensive nature of the victim's injuries and her credible testimony that the sex was nonconsensual, Appellant's proffered character evidence was

not likely to change the outcome of the trial. *See Spotz, supra*.

With respect to trial counsel's failure to object to testimony from the Commonwealth's expert regarding "force," the court found that there was no arguable merit to such an objection as the Pennsylvania Rules of Evidence permit an expert to opine on the ultimate issue. Additionally, the court explained in its jury instructions that the testimony from the Commonwealth's expert about force was a medical conclusion and it was the role of the jury to determine whether the evidence established the legal element of force. Accordingly, any potential prejudice from the expert's testimony was cured by the court's instructions. *See Hopkins, supra*.

Further, the court found that there was no arguable merit to Appellant's claim that trial counsel's failure to object to testimony from the Commonwealth expert that the victim's injuries were the worst the expert had ever seen. Specifically, the court noted that the expert testimony was relevant because the extent of the victim's injuries was evidence to rebut Appellant's testimony that the parties engaged in consensual sex. Additionally, the jury was presented with extensive evidence of the severity of the victim's injuries from multiple sources so the exclusion of this statement would not have resulted in a different outcome at trial. *See Spotz, supra*.

Finally, the court found that trial counsel could not be found ineffective for failing to object to Appellant's SORNA obligations on the grounds alleged because the case on which Appellant relies, *Commonwealth v. Muhammad*,

241 A.3d 1149 (Pa.Super. 2020), is distinguishable from the instant matter. Unlike Appellant, the defendant in **Muhammad** was not convicted of a crime involving sexual conduct.

The record supports the PCRA court's analysis and disposition of the issues raised on appeal. **See Beatty, supra**; **Boyd, supra**. Accordingly, we affirm on the basis of the PCRA court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2022

## IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-67-CR-0001230-2017

        : 

    v.                           : 

        :     **PCRA**

ETHAN W. RIPPEY,             : 

    **Defendant**             : 

COUNSEL OF RECORD:

K. Scott Carlson, Esquire                Zak T. Goldstein, Esquire
Counsel for the Commonwealth       Counsel for the Defense

## ORDER & OPINION IN SUPPORT OF ORDER

Defendant, Ethan W. Rippey, by and through his counsel, Zak T. Goldstein, Esquire, filed a Post-Conviction Relief Act (hereinafter: PCRA) petition. A PCRA hearing was held and, upon its conclusion, we took the matter under advisement. After consideration of all relevant testimony, evidence, memoranda, and case law, this Court, for the reasons cited *infra*, hereby, DENIES the Defendant's PCRA petition.

## I.    Procedural History

At the conclusion of a jury trial, begun on November 13, 2018, a jury of Defendant's peers returned a verdict of guilty for rape,[1] involuntary deviate sexual intercourse,[2] sexual assault,[3] and simple assault.[4] Defendant was sentenced on February 20, 2019 to an aggregate

---

[1] 18 Pa.C.S.A. § 3121(a)(1)
[2] 18 Pa.C.S.A. § 3123(a)(1)
[3] 18 Pa.C.S.A. § 3124.1
[4] 18 Pa.C.S.A. § 2701(a)(1)

1

of 17 to 34 years in a state correctional institution. Post-sentence motions were submitted on March 4, 2019 and denied on March 25, 2019. Notice of Appeal was timely filed on April 17, 2019 and, on March 20, 2020, the Superior Court affirmed Defendant's judgment of sentence.

On December 3, 2020, Defendant timely filed the instant PCRA petition—his first. Following some wrangling between the parties regarding the filing prerequisites, a PCRA hearing was held on May 21, 2021. At the conclusion of that proceeding, the matter was taken under advisement. The parties availed themselves of the opportunity to file memoranda. The matter is now ripe for decision.

## II.    PCRA Motions

### A. Ineffective Assistance of Counsel

Defendant's claims sound in ineffective assistance of counsel. As such, the following excerpts of law are relevant in this context.

*Ab initio*, a court cannot have jurisdiction to hear an untimely PCRA petition. *Commonwealth v. Robinson*, 837 A.2d 1157, 1161 (Pa. 2003) (citing *Commonwealth v. Rienzi*, 827 A.2d 369, 371 (Pa. 2003) (citations omitted)). "[A]ny PCRA petition, including a second or subsequent petition, must be filed within one year of the date the judgment becomes final." *Commonwealth v. Breakiron*, 781 A.2d 94, 97 (Pa. 2001) (citing 42 Pa.C.S. § 9545(b)(1)). And, "[a] judgment becomes final at the conclusion of direct review or at the expiration of time for seeking the review." *Id.*, at 42 Pa.C.S. § 9545(b)(3)).

2

Here, Defendant's direct appeal was decided on March 20, 2020. The instant PCRA petition was docketed on December 3, 2020, well within the one year period to file a first petition. The petition is facially timely and, so, we proceed on to the law governing ineffective assistance of counsel claims.

It is stated in *Strickland v. Washington* that, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686 (1984). Pennsylvania codified this principle in the Post-Conviction Relief Act, which provides post-conviction relief for "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Pennsylvania's Supreme Court has interpreted this to mean that to show ineffective assistance of counsel, a petitioner must show that:

> (1) the claim underlying the ineffectiveness claim has arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) counsel's actions resulted in prejudice to petitioner.

*Commonwealth v. Cox*, 983 A.2d 666, 678 (Pa. 2009) (citing *Commonwealth v. Collins*, 957 A.2d 237, 244 (Pa. 2008)); See also, *Commonwealth v. Rollins*, 738 A.2d 435, 441 (Pa. 1999) (citations omitted). "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" 983 A.2d 666, 678 (Pa. 2009) (quoting

3

*Commonwealth v. Williams*, 899 A.2d 1060, 1064 (Pa. 2006) (quoting *Commonwealth v. Howard*, 719 A.2d 233, 237 (Pa. 1998))). In *Commonwealth v. Pierce*, the Pennsylvania Supreme Court wrote that, "[p]rejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." 786 A.2d 203, 213 (Pa. 2001) (citing *Commonwealth v. Kimball*, 724 A.2d 326, 332 (Pa. 1999)), *abrogated on other grounds*, *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002); See also, *Commonwealth v. Fletcher*, 986 A.2d 759, 772 (Pa. 2009) (citations omitted). And, "the law presumes that counsel was effective and the burden of proving that this presumption is false rests with the petitioner." 983 A.2d 666, 678 (Pa. 2009) (citing *Commonwealth v. Basemore*, 744 A.2d 717, 728 (Pa. 2000)).

Findings of a PCRA court will not be disturbed unless the certified record belies those findings. *Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. Ct. 2001). "Further, the PCRA court's credibility determinations are binding on [appellate courts], where there is record support for those determinations." *Commonwealth v. Anderson*, 995 A.2d 1184, 1189 (Pa. Super. Ct. 2010) (*Commonwealth v. R. Johnson*, 966 A.2d 523, 539 (Pa. 2009)). This basic law stated, we proceed to the specific claims.

### 1. Character Evidence

Defendant's first claim is that his trial counsel was ineffective for failing to call character witnesses. Defendant avers that he had no prior criminal record and that he did

4

have numerous persons willing to testify to his reputation for peacefulness[5] and his reputation for being law-abiding.

Beginning with the first prong of the test for ineffectiveness, per Pa.R.E.(a)(2)(A), a defendant may offer evidence of a pertinent trait, such as the general peacefulness and law-abiding nature of Defendant, and, where admitted, the Commonwealth may seek to rebut it. *Commonwealth v. Butterbaugh*, 91 A.3d 1247, 1263 (Pa. Super. Ct. 2014) (citing Pa.R.E. 404(a)(2)(A); 42 Pa.Cons.Stat.Ann. § 5918) ("When the accused offers evidence of a pertinent character trait that is admitted, it opens the door and allows the Commonwealth to rebut the evidence relating to defendant's character trait."). "'Evidence of good character is substantive, not mere makeweight evidence, and *may*, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty.'" *Id.*, at 1264 (quoting *Commonwealth v. Harris*, 785 A.2d 998, 1000 (Pa. Super. Ct. 2001) (citation omitted in original) (emphasis added). And, "[e]vidence relating to a defendant's good character is so important that failure to present available character witnesses *may* constitute ineffective assistance of counsel if there is no reasonable basis for such failure." *Id.* (citing *Commonwealth v. Mickens*, 597 A.2d 1196, 1203 (Pa. Super. Ct. 1991)) (emphasis added). In the context of this case there was a reasonable basis for the defense not to call the witnesses

---

5 The Court notes, with interest, that a significant component of the evidence the Defendant seeks to rebut with reputation evidence of peacefulness came from his own testimony, when he described that he likes to have rough sex with females. This admission, coupled with the medical evidence of the extreme injuries suffered by the victim, significantly undercut the potential utility of peacefulness character testimony.

5

who appeared at the PCRA hearing,[6] as is discussed in detail below.

We turn to the second prong which considers whether counsel's actions lacked a reasonable basis. In assessing this prong, we bear the following in mind:

> Trial counsel's failure to use appellant's numerous relatives as character witnesses was based upon his perception of familial character evidence. He testified that, "[a]s a policy matter, I don't ever recall ever putting on character evidence of family members. I think the jury just thinks it's garbage." Counsel admits that he never discussed with appellant the possibility of presenting character evidence from appellant's family. Counsel's preconceived notions about familial character evidence led to his failure to even interview appellant's relatives, and precluded him from assessing their credibility. Although familial character witnesses generally lack the credibility of unbiased non-familial witnesses, an attitude that they are *per se* worthless, is sufficient evidence of counsel's competency.
>
> **In light of the overwhelming need for character evidence in a case such as this[, where the defendant was convicted of rape, statutory rape, incest, indecent assault, etc.], counsel's limited investigation into the quantity and/or quality of potential character witnesses on behalf of appellant, and counsel's prejudice toward familial witnesses, we find no reasonable basis to support trial counsel's decision not to call *any* character witnesses.**

*Commonwealth v. Hull*, 982 A.2d 1020, 1026 (Pa. Super. Ct. 2009) (quoting *Commonwealth v. Weiss*, 606 A.2d 439, 443 (Pa. 1992)) (emphasis in original). Our Supreme Court has taken a very dim view of those who are completely dismissive of the power of character evidence.

Trial counsel was not dismissive of the power of character evidence in this case. During the PCRA proceedings, the following relevant exchange occurred with trial counsel.

---

6 Like any other evidence, character evidence is not presented in a vacuum and must be probative to issues being litigated. This Court notes that the Defendant presented no character witnesses from the York College community who were subjected to cross-examination by the Commonwealth. As such, their credibility could not be tested on cross-examination, nor evaluated by the Court.

6

Diana Spurlin, Esquire:

Defense:        Now, why did you not call character witnesses in this case?

Spurlin:        Two reasons. One, just as a general matter, I've never found jurors *that I've spoken to after trial to really get anything out of character testimony.*

                Beyond that, *I would still consider using it* **if they could not have been impeached with some sort of - - something that would actually be worse.** In this case, I was aware of a prior ARD. I did not represent Ethan, so I didn't know all the facts, but I believe it involved tire slashing, and I did not want that to be brought up in impeachment because I was worried the jury would hear that and would think much worse of him than whatever minimal help the character evidence could provide.

Defense:        Okay. So you didn't think there would be any value in that jury instruction?

Spurlin:        *It's not that I didn't think there'd be any value. It's a combination of my personal experience in York County and York County jurors just not really grasping or understanding the value or the seriousness of character evidence. And, also, again, just that I was worried about, on balance, whether the jury would care more about the character testimony versus hearing that there was a prior criminal mischief or whatever that was.*

Defense:        Okay. So you were pretty worried about the witnesses being impeached. Is that fair to say?

Spurlin:        Yeah.

(Notes of Testimony, 5/21/21, at 9-10.) (emphasis added). Unlike the trial counsel in *Weiss, supra,* trial counsel, here, utilized her hard-won experience with York County jurors, in particular, to begin assessing whether to call character witnesses. Trial counsel even

7

indicated that *in spite* of this assessment she *still* would consider using character witnesses so long as there was not the specter of prior bad conduct threatening to rear its ugly head. Further, although Attorney Spurlin did not malign her own client at the PCRA hearing, she *knew* her client and his prior history of alleged nonconsensual 'rough sex' and contact with the same victim. By not calling character witnesses, of what she deemed minimal probative value, Attorney Spurlin eclipsed the opportunity of the Commonwealth to cross-examine them to Defendant's detriment, as they did at the PCRA hearing, by repeatedly highlighting his appetite for rough sex and anal sex to a jury of York Countians.

The Superior Court has stated that "'[a]lthough weigh the alternatives we must, the balance tips in favor of a finding of effective assistance *as soon as it is determined that trial counsel's decisions had any reasonable basis.*'" *Commonwealth v. Hull*, 982 A.2d 1020, 1023 (Pa. Super. Ct. 2009) (quoting *Commonwealth v. Blount*, 647 A.2d 199, 207 (Pa. 1994) (citation omitted)). And, "[c]ounsel has a reasonable, strategic basis for not calling character witnesses if he has a legitimate reason to believe that the Commonwealth would cross-examine the witnesses concerning bad-character evidence." *Id.* (citing *Commonwealth v. Van Horn*, 797 A.2d 983, 988 (Pa. Super. Ct. 2002) (citations omitted)). Finally, where bad character evidence exists that did not involve arrests then the Commonwealth may cross-examine character witnesses regarding particular acts of misconduct to test the accuracy of the character witness' testimony and their standards for measuring reputation. See *Commonwealth v. Peterkin*, 649 A.2d 121, 127 (Pa. 1994).

8

Trial counsel was incorrect in believing that a prior instance of criminal mischief by Defendant, resolved through Accelerated Rehabilitative Disposition (hereinafter: ARD), could have been used to cross-examine any character witnesses. Pa.R.E. 405(a)(2) ("in a criminal case, on cross-examination of a character witness, inquiry into allegations of other criminal conduct by the defendant, not resulting in conviction, is not permissible."). ARD is not a conviction for impeachment purposes. See *Commonwealth v. Hoover*, 16 A.3d 1148, 1150 (Pa. Super. Ct. 2011) (citing *Commonwealth v. Brown*, 673 A.2d 975, 978-79 (Pa. Super. Ct. 1996)). *However*, this does not mean that trial counsel's instincts were wholly in error such that there was no reasonable basis for her actions.

During the PCRA proceedings, trial counsel was asked to assume that the Commonwealth would have been allowed to cross-examine each character witness regarding Defendant's admission that he had rough sex with the victim while she was intoxicated. (N.T., 5/21/21, at 16.) The Commonwealth then inquired whether this might have affected the jury's perception of Defendant and trial counsel responded: "It could have." *Id.*, at 16-17. We agree. In consideration of this, we turn to the facts adduced at the PCRA hearing when the Commonwealth engaged in such cross-examination.

Insofar as the character witnesses offered by Defendant at his PCRA hearing, they universally proclaimed that Defendant's community[7] reputation for law abiding and peaceful

---

7 The community applied here was apparently Defendant's point of origin in Maryland, not York/the York College community where he lived when he committed his crimes.

behavior was good. (Notes of Testimony, 5/21/21, at 26, 35, 42, 47, 52, and 57.) The witnesses indicated that the community's opinion of Defendant would not change in light of any revelations that Defendant enjoyed rough sex with an intoxicated complainant on a prior occasion. *Id.*, at 30, 37, 44-45, 49, 54, and 58-59. Yet, their various communities did not discuss Defendant's sexual preference for rough sex. *Id.*, at 31, 38, 44, 49, 54, and 58, nor were they or the community all aware that Defendant conceded that he enjoyed rough sex with the complainant while she was intoxicated. *Id.*, at 31-32, 38, 44, 49, 54, and 58. Thus, the Commonwealth would have been permitted to cross-examine these witnesses on Defendant's professed sexual proclivities.

Incredibly, inconceivably, and sycophantically, the character witnesses indicated that the community opinion of Defendant would not change in light of such information. *Id.*, at 30, 37, 44-45, 49, 54, and 58-59. This Court could not find credible any witness that proclaimed that an admission of preference for "rough sex," which should not cause cultural opprobrium in this day and age, *coupled with an admission that the sexual partner was intoxicated* would in no wise alter the perception of Defendant—particularly regarding his reputation for peacefulness. Defendant's euphemism of "rough sex," as applied in this case was found by the jury to be sexual assault. Of course, this would be a matter for the jury.

While it is for the jury to ultimately adjudge credibility at trial, not the Court, the defense does bear the burden on PCRA of establishing that an alternate strategy not chosen offered a potential for success, substantially greater than the course actually pursued. *Cox,*

10

*supra* at 678. To assess whether the defense has met this burden, the Court must make some assessment as to whether the evidence the Defendant claims was negligently not presented, had the potential to change the outcome of this trial. This Court finds it does not. The witnesses could not have altered the outcome of the trial due to their incredibility, where they would not let any facts get in the way of a predetermined and inflexible conclusion.

Intriguingly, there was one minor example of a witness considering, before rejecting, the notion that Defendant's reputation might have suffered as a result of his admissions. Defendant's aunt, *Id.*, at 29, Christy Garman, equivocated when asked if Defendant's reputation might be altered by wider dissemination of Defendant's concession that he enjoyed rough sex with the complainant, which occurred while she was intoxicated:

| Cmwlth: | And was the community aware that the Defendant conceded that he enjoyed having rough sex with the complainant, and that occurred while she was intoxicated? |
|---|---|
| Witness: | No. |
| Cmwlth: | If you think - - if the community was aware of that, do you think that that might change the reputation that the Defendant had? |
| Witness: | *Within the family*, I don't think so. And, *truthfully, within my work environment*, we have a lot of very diverse work environment, [sic] and *I don't know how they would view that. I truly don't.* It's not an environment that would have - - his reputation with them was a certain thing. They all have their own personal lives too. And, yeah, I don't think so. |

*Id.*, at 38 (emphasis added). It is certainly true that Christy Garman landed on a statement that she did not *think* that the community perception of Defendant would change in light of

11

such revelations; however, this Court finds that she was candidly admitting, unlike most of the other character witnesses offered, whom we find incredible on the point, that she could not say for certain how Defendant's reputation might hold up with non-family members when sordid details were brought to the fore. This dovetails with the other witnesses indicating that they would not have discussed Defendant's sex life.[8]

Defendant's other aunt, Janet Garman, asked a similar query, responded that "I honestly don't know that the community would believe that a hundred percent." *Id.*, at 49. The Commonwealth pushed on this concept:

Cmwlth:     So even though the Defendant admitted to that part of it happening, [that he enjoyed rough sex with the intoxicated complainant,] they wouldn't believe that it happened?

Witness:     The community that I'm part of knows Ethan as being law-abiding, peaceful, well-respected, hard-working part of our community. So that's how we know Ethan.

*Id.*, at 49. Janet Garman's perception seems to be that even Defendant's own *admissions*, when contrary to how the community perceived him, would be discounted in favor of preconceived notions. This is problematic. It reflects an inflexible predisposition in favor of the Defendant that undermines all credibility of the witness. In short, this witness, as with the others presented by the defense, made clear they would say, hold, and express only positive opinions regarding the Defendant regardless of any *proven* facts to the contrary, even if they

8 To be clear on this point, this is not and never has been an issue of sexual morality in this case. Due to the victim's allegations of lack of consent and the extreme physical injuries she suffered, the Defendant's own explanation that he enjoyed "rough sex" went directly to elements of the crime charged.

12

originated with the Defendant. This statement from this witness demonstrates what was so unbelievable about all of Defendant's character witnesses—save Christy Garman—they would not even entertain the possibility that community perceptions might evolve in light of Defendant's own inculpatory admissions. We cannot find these witnesses credible, nor can we conceive of a jury doing so. These were not character witnesses, so much as blind adherents to the Ethan Rippey defense.

Merely stating that one has or had character witnesses cannot alone be the standard for granting relief, or we would be trying all cases twice within this Commonwealth. The first case would be tried without character witnesses, and then, if unsuccessful, each defendant will get a second trial merely by alleging the absence of character witnesses. While the Court recognizes the value of character witnesses in appropriate cases and situations, such a black and white rule and outcome cannot be what the appellate courts intend. Character witnesses must have some relevance in time and place and they must have some indicia of credibility, as opposed to merely slavish dedication to the Defendant. These witnesses possessed none of the relevant attributes, so as to create a likelihood of a different jury outcome, and possessed all of the negative unthinking attributes that rendered their testimony incredible.

It must be remembered that counsel's actions will not be found to have lacked a rational basis unless it is proven that an alternative strategy provided a *substantially greater* chance of success. Regarding her injuries, the victim, Kaitlyn Huber, testified as follows:

13

Cmwlth:     Okay. And what were your injuries as a result of this?

Huber:      *I had tears* and - - I don't even know what you would call them in my vagina and my anus. *I hurt all over. I couldn't go to the bathroom for weeks without feeling it, without hurting, without bleeding when I was wiping. I got a yeast infection from it that hurt even more.*

            So then the injuries I had gotten from that night, *I couldn't control when I went to the bathroom. I ruined so many clothes and sheets.*

Cmwlth:     When you say go to the bathroom, what do you mean by that? What injury was affecting that?

Huber:      The one from my anus.

Cmwlth:     Okay. So you couldn't - - when you say you couldn't control, *you couldn't control your bowel movements?*

Huber:      *Yeah.*

Cmwlth:     Okay. Did you seek any further - - or consult with anyone regarding these injuries?

Huber:      Aside from the night at the hospital when they gave me all of the medications to prevent STDs and pregnancy, they said that I had to go follow up with a GYN to make sure that the injuries were healing okay, to make sure that everything was fine, to make sure that I was tested again for STDs. So, yeah, I did. I had to see more people.

Cmwlth:     So you followed up with doctors after this?

Huber:      Yeah.

(Notes of Testimony, 11/13/18, at 174-76.) (emphasis added). This case was *not* the typical he-said-she-said scenario. The victim incurred injuries so severe that she was incontinent and

14

required follow-up care. It beggars belief beyond all comprehension that a young lady of Ms. Huber's background would consent to the infliction of such horrendous injuries and debasement. The jury found her credibly. With the severity of wounds inflicted upon the victim, it would be difficult for any alternative strategy to have a greater chance of success— let alone a *substantially* greater chance of success. As such, Defendant cannot meet the second prong of a test in which he must meet all three prongs in order to succeed. Nonetheless, in the interest of completeness, we continue on.

The third prong of the test for ineffectiveness probes whether Defendant suffered any prejudice. Specifically, we inquire whether Defendant has demonstrated a reasonable probability that a different outcome would have occurred absent counsel's alleged error. We cannot find that Defendant has met this burden. In his Petitioner's Supplemental Brief. at 5-6 (quoting *Commonwealth v. Weiss*, 606 A.2d 439, 443 (Pa. 1992)). Defendant argues that, as in *Weiss*, this was a he-said-she-said case involving significant injuries. This is true; however, *unlike Weiss*, trial counsel, here, did not wholly reject the utility of familial character evidence due to prejudice; but, rather, trial counsel decided against using character evidence because of her *experience* with York County jurors informing her of their thoughts on the subject *and* because she feared prior bad conduct being utilized to impeach said witnesses. That trial counsel was concerned about the wrong prior bad acts does not obviate the fact that prior bad acts existed, namely Defendant's own admissions regarding his enjoyment of rough sex with an intoxicated plaintiff on a prior occasion.

15

As for the victim's injuries, in his Petitioner's Supplemental Brief, at 5-6, Defendant argues that his case is like that of *Weiss, supra,* in that there were significant injuries there too and yet a new trial was granted. Defendant fails to observe that the victim in *Weiss* was the four year old daughter of the defendant who could, axiomatically, not consent to sexual acts *and* there were roommates of the father who were potential assailants—a circumstance not present here. See *Weiss,* 606 A.2d, at 441. Here, the victim was an adult. Defendant would have a jury believe that the victim, albeit intoxicated, submitted willingly to sexual acts that left her so incontinent that she ruined "**so many** clothes and sheets." (Notes of Testimony, 11/13/18, at 175.) Thus, *unlike Weiss,* the injuries were independent evidence of a sexual assault. Further, by Defendant's own account, at trial, after he initially penetrated the victim's anus and was told to stop, (N.T., 11/13/18, at 427), Defendant *again* penetrated the victim's anus because he "believed it could work a little bit better" due to the addition of a lubricated condom. *Id.,* at 429. Though Defendant characterized this as a mutually agreed upon second attempt, *Id.,* the victim most assuredly did not. *Id.,* at 165-67. The jury believed her, not him. And, Defendant's voluntary admission that he had previously engaged the victim in rough sex while she was intoxicated on a prior occasion were simply too much to be overborne by the defective character evidence presented. As such, even if, *arguendo,* it was error for trial counsel not to have called character witnesses in the abstract, the properly admitted evidence was overwhelming. See *Commonwealth v. Hoover,* 16 A.3d 1148, 1150 (Pa. Super. Ct. 2011). There is simply no *reasonable* probability of a different outcome were

16

character witnesses to have been presented.

Finally, as a brief aside, we will address the question raised by this Court during the PCRA hearing and answered by Defendant in his Petitioner's Supplemental Brief, at 6-7. This Court had inquired whether the character witnesses offered were really the most appropriate ones considering they were not members of the York College community and would not have been familiar with Defendant's reputation for the relevant traits within that community. Counsel for the defense has responded well in arguing that this cannot be a requirement for character witnesses, because it would exclude character witnesses in any case where the offense occurred in a community in which the defendant was a mere visitor. *Id.* Yet, this response is made by changing the facts. Under circumstances such as those proposed by Defendant, of a vacationer being accused of a crime, then character witnesses from the majority of that person's life would make good sense. However, where, as here, the Defendant was *part of the community* in which the offense occurred then we still question the utility of character witnesses separated physically and temporally from the community in which Defendant was living and surely had a reputation. The defense had the choice of which witnesses to present at the PCRA hearing.

The character witnesses that were offered addressed Defendant's reputation for law abiding and peaceful behavior under general circumstances; however, by Defendant's own father's admission, the community would not have discussed Defendant's reputation for behavior in general sexual situations. (N.T., 5/21/21, at 31-32.) David Frost indicated that the

17

off-roading community from which he knew Defendant would not have discussed the sex lives of its members as their group was a family group and such topics do not come up in conversation. *Id.*, at 43-45. Janet Garman stated, "[t]he community that I know of doesn't talk about other people's sex lives." *Id.*, at 49. Though the character witnesses offered could not discuss Defendant's reputation regarding his sexual relationships, they did offer testimony regarding his general reputation for law abiding behavior.[9] In addition, although not the basis for this decision, of concern to this Court is that Defendant's proffered character witnesses were not from the *York County* community and, more specifically, from the community that exists at York College.

In fact, this Court can locate at least one case in which the Superior Court utilizes the phrase "relevant community." In *St. Rd. Bar & Grille, Inc. v. Pa. Liquor Control Bd.*, 876 A.2d 346, 358 (Pa. 2005), our Supreme Court refers to the "relevant community" in which character evidence is at issue. Granted, this was a civil case and the nature of the community was not the real issue, which was how broadly to interpret the requirement of good repute in a liquor control statute. Nonetheless, the phrase "relevant community" was, however briefly, mentioned.

Since all evidence, including character evidence, must be relevant to be admissible, it

---

9 This testimony reflects the marginal utility of bringing in one's relatives and former employers when charged with the type of sex offense that happens in privacy. Simply because one does not steal from the company till or engage in other common law crimes has, at best, a tangential reflection upon one's sexual conduct in the privacy behind closed doors. In this case, presenting such collateral witnesses would not have created a substantially greater chance of success in the face of Defendant's self-destructive testimony, the victim's compelling testimony, and overwhelming medical evidence.

18

only makes sense that a given community must be relevant. This Court does not find that the Defendant's selection of witnesses are from an irrelevant community, they are simply not from the most relevant community—the one in which the Defendant resided, socialized, and was known by peers at the time he committed his sexual offenses. As our decision does not rely upon the result of this question and is only aided by it, we made a cursory inquiry into researching it; however, we found ample cases in our sister jurisdictions utilizing the phrasing "relevant community." The New Jersey case of *Fitzgerald v. Stanley Roberts, Inc.*, 895 A.2d 405, (N.J. 2006) is of interest. There, New Jersey's Supreme Court stated the following:

> At common law, in New Jersey and elsewhere, the community from which reputation for a particular character trait could be divined was limited to the place where a person lived. However, that is no longer the rule in this state, nor in most jurisdictions. Commentators have noted:
>
>> [T]oday it is generally agreed that proof may be made not only of the reputation of the witness where he lives, but also of his repute, as long as it is "general" and established, in any substantial community of people among whom he is well known, such as the group with whom he works, does business **or goes to school.**
>
> Thus, in order to satisfy the foundation for reputation testimony, what is required is the establishment of the relationship of both the subject and the witness to **the relevant community** and the existence of an expressed community opinion regarding a trait of the subject's character.

*Id.*, at 420-21 (citations and parentheticals omitted) (emphasis added). That Pennsylvania law may not have fleshed this issue out does not mean that it is not an issue relevant to this case. Other jurisdictions have considered the matter in the context of extending or expanding the

19

scope of what qualifies as a relevant community. A corollary inquiry is whether a communities in which a reputation has been formed should be excluded as being too attenuated from the community in which the crime is alleged to have occurred and in which the defendant has, perhaps, a general reputation independent of his general reputation amongst an irrelevant community. As we have indicated, we believe that to carry his burden of proving prejudice and a likely different jury outcome the Defendant should have presented members of his college community who could have spoken to his reputation in that relevant context, as opposed to predisposed relatives and out-of-state former high school employers.

Regardless of this aside, which we consider to be an area of undeveloped Pennsylvania law, as to this claim, Defendant cannot meet two of the three prongs of the test for ineffectiveness. We would emphasize that the issue raised by this Court of whether a community is relevant for purposes of character evidence is an issue that would be valuable for the appellate courts to address in view of the strong mandate for character evidence; but, ultimately, it played no role in the decision of this claim. As such, Defendant's first claim fails.

### 2. *Expert's Testimony that Injuries Occurred "By Force"*

Defendant's second claim is that trial counsel was ineffective for failing to object to an expert witness' testimony that the victim's injuries occurred "by force," which is an element of the statutes in question. Defendant submits that this was an improper usurpation of the role of jury. Defendant also avers that trial counsel compounded the error by failing to

object to the Court's repeated referrals to this testimony.

Turning to the first prong of the test for ineffectiveness, there is no merit to this claim. Defendant notes that the Superior Court found that this issue had been waived. Post-Conviction Relief Act Petition Pursuant to 42 Pa.C.S. § 9543, at 12. However, Defendant ignores that this Court already made answer in our previous 1925(a) opinion of June 19, 2019 and that the Superior Court provided analysis of the claim were it not to have been waived. Specifically, the Superior Court stated the following:

> Pa.R.E. 704 permits expert opinion testimony on the ultimate issue. Pa.R.E. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). The court has discretion to admit or exclude expert opinions on the ultimate issue, "depending on the helpfulness of the testimony versus the potential to cause confusion or prejudice." *McManon v. Washko*, 906 A.2d 1259, 1278-79 (Pa. Super. 2006) (citations omitted).

*Commonwealth v. Rippey*, 229 A.3d 360, 2020 Pa. Super. Unpub. LEXIS 971, at 17-18 (Pa. Super. Ct. 2020). Additionally, the Superior Court noted:

> Moreover, the trial court gave the following jury instruction: "Nurse Huggins [testified] that the injuries received by [the victim] were caused by forcible penetration. That was a medical conclusion. It is up to the jury to decide whether or not that testimony establishes beyond a reasonable doubt the legal element of force[.] N.T. Trial, 11/15/18, at 60, 64-65. We presume that the jury followed the trial court's cautionary instruction and that any potential prejudice regarding Ms. Huggins' testimony was cured. *See Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 269 (Pa. 2013) (presuming that juries follow instructions); *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 300 (Pa. 1998) (concluding that any prejudice that the defendant may have faced in murder case based on the coroner witness's use of the word "homicide" was cured by the trial court's cautionary instruction that it was the jury's responsibility to decide the ultimate issue in the case).

*Id.*, at 18 n. 5. See also *Commonwealth v. Poplawski*, 130 A.3d 697, 717(Pa. 2014) (citations

21

omitted) ("Juries are presumed to follow instructions[.]").

In addition to the foregoing, the case of *Hartzell v. Sauers* is instructive. There, the federal district court stated the following:

> Federal law, **like Pennsylvania law**, permits an expert to testify to an ultimate issue. *See* Fed. R. Evid. 704(a). It thus appears that nothing in federal law prohibits the Commonwealth's expert from testifying that the complaining witness had been sexually abused. *See, e.g.. Moses v. Payne*, 555 F.3d 747, 761 (9th Cir. 2009) (noting that the Supreme Court has not held that the Constitution forbids an expert from testifying to an ultimate issue in a case).

2011 U.S. Dist. LEXIS 11582. at 8 (M.D. Pa. Feb. 7 2011) (emphasis added). There is no merit to this claim.

In the interest of completeness, the Court probes whether trial counsel's actions lacked a reasonable basis. The alternative strategy proposed by Defendant would have been for counsel to have objected to any permutation of expert testimony involving force as a term to describe the mechanisms of injuries. As already stated, Pa.R.E. 704 permits expert testimony on the ultimate issue: however, there can be no claim made that the nurse's testimony could have caused confusion, misled jurors, or caused prejudice where the Defendant's own testimony, regarding his fondness for rough intercourse, also established as much. In Defendant's petition, PCRA counsel argues that"[p]ermitting the Commonwealth's expert to testify not to consent, but to force, was a distinction without a difference." Post-Conviction Relief Act Petition Pursuant to 42 Pa.C.S. § 9543, at 10. The Defendant opining, during his trial testimony, that consensual sex of a rough nature occurred versus terms regarding force, utilized by the expert, is also a distinction without a difference. If there was

22

error, it was harmless in light of Defendant's own testimony. However, due to the nature of how cases are presented, the Commonwealth elicited testimony, prior to Defendant's testimony, from the expert that was helpful to the jury in determining whether force was employed. Per Pa.R.E. 704 this was permitted. Moreover, as the Commonwealth necessarily had to prove force and there are only so many words that they could elicit from witnesses in an effort to establish that element, an objection to usage of that general term would not have succeeded.

As for the prejudice prong of the test for ineffectiveness, we inquire whether, but for counsel's supposed ineffectiveness, there would have been a different outcome. We cannot find that there would have been. Even if variations of phrases that included the word force had not been employed, the jury would have heard about an astounding number of injuries that were inflicted upon the victim. We cannot find that any juror would not have concluded that there was "forcible compulsion" due to the extreme injuries that left the victim incontinent for an extensive period thereafter.

Before concluding, we would address Defendant's argument, from his Petitioner's Supplemental Brief, at 7-8, that trial counsel had no strategic basis for failing to object to the expert's conclusion regarding force and that trial counsel agreed that she should have objected. To begin, though it hails from the context of trial counsel impugning their own ineffectiveness at trial, or on direct appeal, the general rule is that counsel cannot raise their own ineffectiveness. *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2011) (citing

23

*Commonwealth v. Bennett*. 930 A.2d 1264, 1274 (Pa. 2007)). Nonetheless, we certainly take Defendant's point and have considered it. However, as the Commonwealth points out in their Commonwealth's Memorandum in Opposition to Defendant's Ineffective Assistance of Counsel Claims. at 10 (citing (N.T.. 11/13/18, at 17-18)), at trial. trial counsel admitted that "[i]f the testimony is going to be limited to what's consistent with what - - based on the literature. I can't object to that." When it came to the notion of the injuries being caused by force. that's precisely what the expert did. That trial counsel may have reconsidered her stance by the time of the PCRA hearing is unavailing. For the reasons already outlined, above, the expert's testimony on force was admissible. Trial counsel's seeming loyalty to her client on PCRA, while laudable, does not, for those reasons, change our assessment.

As to this PCRA claim, Defendant has not met a single one of the three prongs for the test of ineffectiveness. In order for the claim to succeed, Defendant needed to meet *all three* prongs. The claim fails of necessity.

3. *Expert's Testimony that Injuries Were Worst She had Seen*

Defendant's third claim is that, when the treating nurse, Elizabeth Jenkins, and Nurse Huggins testified that the injuries extant in this case were the worst that they had ever seen, trial counsel was ineffective for failing to object to irrelevant and unfairly prejudicial testimony that, additionally, bolstered the victim's credibility. We disagree.

As the Superior Court stated in *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa. Super. Ct. 2008), "'Generally speaking, the admission of expert testimony is a matter left

24

largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion.'" (quoting *Commonwealth v. Brown*, 596 A.2d 840, 842 (Pa. Super. Ct. 1991), *appeal denied*, 616 A.2d 982 (Pa. 1992) (additional citation omitted)). The testimony of each nurse was absolutely relevant in that it rebutted the defense's self-serving claim that this was consensual intercourse of a rough variety, creating an inference that it was within the scope of varied, yet consensual, human sexual conduct.

There is a fine line across which a fact-finder could have agreed with Defendant's characterization of events due to the variety of sexual preferences found amongst humans. Thus, the nature and degree of injuries become relevant in determining whether the victim had willingly consented to rough intercourse that resulted in, *inter alia*, incontinence for an extended period of time. Each nurse offered an opinion that no lay witness could have offered as they would lack experience in sexual assault treatment and evidence gathering. See, e.g., *Commonwealth v. Rounds*, 542 A.2d 997, 999 (Pa. 1988) ("The purpose of expert testimony is to assist the factfinder in understanding issues which are complex or go beyond common knowledge."); Accord *Commonwealth v. Mendez*, 74 A.3d 256, 262 (Pa. Super. Ct. 2013) (quoting *Commonwealth v. Zook*, 615 A.2d 1, 11 (Pa. 1992) ("[T]he purpose of expert testimony is to assist in grasping complex issues not within the ordinary knowledge, intelligence and experience of the jury. Moreover, the admission of this testimony is a matter for the discretion of the trial court and should not be disturbed unless there is a clear abuse of discretion.")). That those opinions did not specifically reference other cases to compare and

25

contrast them does not negate that the nurses formed their opinions in light of their specialized experience.

Briefly, we address the merit of the sub-claim that the experts' testimony regarding severity of injuries bolstered the victim's credibility. For the following reason, this is incorrect. In *Commonwealth v. Mendez, supra*, the Superior Court stated the following, which is relevant:

> In general, expert testimony cannot be used to bolster the credibility of a witness. Whether the expert's opinion is offered to attack or to enhance, it assumes the same impact—an unwarranted appearance of authority in the subject of credibility which is within the facility of the ordinary juror to assess. However, testimony regarding conduct or behavior of victims of sexual assaults is appropriate for expert testimony because **the physical condition of a sexual assault victim is not a matter that is typically within the knowledge of average jurors.** Expert testimony does not encroach upon the jury's province of determining witness credibility since the testimony pertains to objective medical facts, rather than explanations of behavioral patterns.

*Id.* (citations and quotations omitted; formatting changed) (emphasis added). As the Commonwealth aptly notes, "[t]he severity of the injuries was a factor the jury could consider in determining whether the defense of 'rough sex' was credible." Commonwealth's Memorandum in Opposition to Defendant's Ineffective Assistance of Counsel Claims, at 20. For all of the foregoing reasons, there is no merit to the main claim or its sub-part

Turning to the reasonable basis prong of the test for ineffectiveness, we begin with the relevant testimony of trial counsel, Attorney Spurlin, from the PCRA hearing:

Defense: Now, there was . . . some comparison from some of the witnesses that these were some of the most severe injuries

26

they'd seen in more than 200 exams or 270 exams, something like that. Do you remember that?

Spurlin: I do.

Defense: Did you object to that testimony?

Spurlin: I did not.

Defense: Why not?

Spurlin: I recall when, I believe it was the SAFE nurse who actually did the exam, I don't remember her name, when she mentioned it, it was not in response to any sort of question. Obviously if there were a question, how does this exam compare to other ones you've done, I would have jumped up out of my seat. That's not an appropriate question.

Somehow the nurse had slipped this in and just sort of volunteered it, and it was - - it had been said. And I was almost - - I had half a second to decide, do I object to this and draw more attention to it and get the jury to hear it several more times, or do I just hope that no one mentions it again. And I hoped that no one mentioned it again, but that is not what happened.

(N.T., 5/21/21, at 13-14.) The alternative strategy proposed would have been for counsel to have objected; however, where the defense was premised upon *consensual* rough sex, the objection would not have had a *substantially* greater chance of success. The defense had put into issue whether the victim willingly submitted herself to *severely* injurious sex and expert testimony allowing the jury to assess how severe those injuries were was highly relevant. Moreover, as the Commonwealth notes, "[t]rial counsel also acknowledged that this testimony was given as part of the explanation of why the victim needed to see a doctor, and

27

why blunt force trauma was the medical conclusion of the cause of injury." Commonwealth's Memorandum in Opposition to Defendant's Ineffective Assistance of Counsel Claims, at 20 (citing N.T., 5/21/21, at 14.). Establishing the severity of the injuries allowed the jury to weigh the likelihood of consent. We cannot find that the alternative strategy proposed offered a *substantially* greater chance of success and, as such, Defendant cannot establish the second prong of the test for ineffectiveness.

In regards to prejudice, the Superior Court has stated that "even where an expert's testimony went beyond the scope of the expert's report, the defendant is not entitled to relief absent proving he suffered prejudice from the admission of the testimony." *Commonwealth v. Clemat*, 218 A.3d 944, 957 (Pa. Super. Ct. 2019) (summarizing the holding from *Commonwealth v. Henry*, 706 A.2d 313 (Pa. 1997)). We inquire whether there is a reasonable probability of a different outcome but for trial counsel's supposed error and we cannot find that there would have been. This claim ignores the overwhelming evidence presented by the victim's testimony—which, we do not forget, can, standing alone, support Defendant's convictions. It also ignores that the jury heard about the injuries extant in this case. The jury heard the Defendant's own testimony that this case was inconveniencing his studies—the callousness of which the jury surely weighed in assessing Defendant's credibility. (N.T., 11/13/18, at 430.) The jury heard Defendant admit that he tried anal intercourse after having been told to stop a previous attempt—something that, with the victim denying ever having acceded to anal sex attempts, implicates credibility considerations.

28

Finally, as already recounted numerous times, the jury heard Defendant's concession that he enjoyed rough sex with the victim when she was intoxicated. Defendant suffered no prejudice.

For this claim, Defendant failed to meet all three prongs of the test for ineffectiveness. The claim fails.

### 4. *SORNA—Ineffectiveness Claim*

Defendant's final claim is that counsel was ineffective for failing to object to Defendant being made to register pursuant to SORNA, upon his release. Defendant cites to *Commonwealth v. Muhammad*, 241 A.3d 1149, 1152 (Pa. Super. Ct. 2020) (emphasis added) ("We hold that SORNA is unconstitutional *as applied* to Appellant, because it creates an irrebuttable presumption that her convictions for interference and conspiracy[, which are not sexual offenses] make her a risk to commit additional sexual offenses [and Appellant had no prior criminal history].") For the following reasons, we disagree.

*Ab initio*, Defendant submits that, even though *Muhammad*, was decided after Defendant's case, per *Commonwealth c. Duncan*, 237 A.3d 1171 (Pa. Super. Ct. 2020) (citing *Commonwealth v. Lacombe*, 234 A.3d 602 (Pa. 2020)), this Court should find that *Muhammad* represents a retroactive change in law now that courts have found that SORNA may violate the right to reputation. As *Muhammad* is factually distinguishable, this Court need not address whether it is retroactively applicable to Defendant.

As noted by Defendant in his petition, *Muhammad* "had not been convicted of an

29

offense involving sexual conduct, had no prior record, and was unlikely to re-offend." Post-Conviction Relief Act Petition Pursuant to 42 Pa.C.S. § 9543, at 19 (citing *Muhammad, supra*). Only one of those facts is clearly applicable to Defendant. It is true that Defendant had no prior criminal record. However, unlikely *Muhammad*, Defendant's convictions most assuredly involved sexual conduct. As for the notion that there is "simply no evidence in the record from which to conclude that Mr. Rippey cannot be rehabilitated by his lengthy prison sentence and is likely to reoffend," *Id.*, at 20, we respond as we did in our first 1925(a) opinion, which was based upon the evidence in the record and our words at sentencing:

> He also complained how the trial cut into his class schedule, with no apparent remorse for the impact his actions had upon his victim.
>
> . . .
>
> The court considered the Defendant's rehabilitative potential at the time of sentencing. . . . While the Defendant had no prior record score, which was in fact considered at sentencing, during the course of the trial the defense sought to elicit testimony regarding a prior sexual interaction between the Defendant and the victim. What was revealed during this defense questioning was that the victim was extremely intoxicated and in no state of mind to be able to consent to that prior sexual encounter. She woke up not knowing what had occurred, bent over the Defendant's bed with her pants down, with the Defendant pulling up his pants. This evidence was considered as relevant to show the Defendant engaged in sexual misconduct with the same victim on a prior occasion and has a *modus operandi* as it relates to this victim. Specifically, while the Defendant did not have a prior criminal record, the defense revealed that he had previously forced himself upon the intoxicated victim for nonconsensual sex after isolating her, just as he did in the instant case. This was also considered in assessing the danger of the Defendant reoffending in the future, a point where the Court parted ways with the SVP report conclusion that the Defendant had no prior history of sexual offenses.
>
> . . .

30

> [Defendant] called [the victim] a "dirty little slut" as he shoved her out the door of the house where he just raped and sodomized her, in order to cruelly maximize the extent to which she was degraded.
>
> As the severity of the harm and the brutality of the forcible anal sodomy was distinct in severity and impact upon the victim, beyond that suffered in the rape, the Court held that a consecutive sentence was appropriate and just. Considering all of the above information the court found Defendant not to have rehabilitative potential for his lack of remorse for his actions and the trauma he caused the victim.

1925(a) Opinion, 6/19/19, at 6-8 (citations omitted). *Muhammad* is inapposite. As such, there is no merit to this claim.

Trial counsel's testimony has little bearing on this claim where, as Defendant acknowledges, *Muhammad* had not been issued at the time when trial counsel might have objected. See *Commonwealth v. Cox*, 983 A.2d 666, 702 (Pa. 2009) (citing *Commonwealth v. Duffey*, 889 A.2d 56, 71 (Pa. 2005)) ("The law is clear that counsel cannot be held ineffective for failing to anticipate a change in the law."). Defendant admits that the case law he relies upon was released *after* his trial. That case, *Muhammad*, is factually distinguishable. As such, even if trial counsel's actions were not reasonable for lack of then existing grounds to object (even though her actions were reasonable), an objection premised upon the logic of *Muhammad* would not have succeeded—let alone had a *substantially* greater chance of succeeding. Defendant's case and that of *Muhammad* are factually distinguishable. For the same reason, Defendant suffered no prejudice. He is a threat to the sexual and physical safety of others. For all the reasons this Court spoke about, *at great length*, at sentencing, a long

31

incarceration alone will not safeguard potential victims from Defendant's sexual proclivities. As such, SORNA registration is appropriate. On an as-applied basis, this claim fails.

### B. SORNA—Right to Reputation

In addition to his ineffectiveness claim regarding SORNA, the Defendant has also made a challenge to the facial validity of his SORNA registration requirement. The Commonwealth has submitted, in their Commonwealth's Memorandum in Opposition to Defendant's Ineffective Assistance of Counsel Claims, at 23-24, that not only is *Muhammad* inapplicable under the as-applied basis found therein, *Id.*, at 21-23, but that Defendant's facial claim regarding SORNA, premised upon *Muhammad*, should also fail. In fact, Defendant argues in the alternative that we should find that "*Muhammad* presents a retroactive change in law and [that we should] allow Mr. Rippey to challenge his SORNA registration now that the appellate courts have found that SORNA may violate the right to reputation. Post-Conviction Relief Act Petition Pursuant to 32 Pa.C.S. § 9543, at 20 (citations omitted). On this matter, we believe that the Commonwealth prevails under current case law.

Very simply, *Commonwealth v. Muhammad*, 241 A.3d 1149 (Pa. Super. Ct. 2020), submitted by the defense and upon which it founds its SORNA claims, provides the very case law that undermines Defendant on this claim. In *Muhammad*, the Superior Court distinguished the defendant, there, from the defendant in *Commonwealth v. Manzano*, 237 A.3d 1175 (Pa. Super. Ct. 2020), for the following reason:

> The trial court in *Manzano* ordered the defendant to register as a Tier III offender under SORNA based on his *nolo contendere* pleas to the sexual

32

offense of rape of a child, aggravated indecent assault of a child, and indecent assault of a child. Citing *Torsilieri* [232 A.3d 567 (Pa. 2020)], the defendant argued, *inter alia*, that SORNA is unconstitutional because it creates an irrebuttable presumption of dangerousness in violation of his right to reputation under the Pennsylvania Constitution. Without mentioning whether the defendant was raising a facial or an as-applied challenge, this Court rejected his argument, reasoning, **"[U]nlike the defendant in *Torsillieri*, [the defendant] has produced no scientific evidence whatsoever to support his claims that the underlying legislative policy infringes on [his] rights."** *Id.*, at 7. In contrast, we have held in this case that Appellant did not need scientific evidence to prevail, because other evidence in the record established that SORNA is unconstitutional as applied to Appellant.

241 A.3d 1149, 1159-1160 (Pa. Super. Ct. 2020) (bolded emphasis added). Like the

defendant in *Manzano*, Defendant failed to supply this court with any scientific literature to

support his facial challenge to the validity of his SORNA registration requirements. Absent

any further evolution of our case law, we are constrained to deny this portion of Defendant's

SORNA claim as well.

## III.  Conclusion

Based upon the reasons stated above, this Court **DENIES** Defendant's claims for

PCRA relief. No relief is granted.

**BY THE COURT,**

DATED: September 21, 2021          **CRAIG T. TREBILCOCK, JUDGE**

33